Ramon Pedro HERNANDEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 68008.

Court of Criminal Appeals of Texas, En Banc.

Jan. 20, 1982.

Rehearing Denied Jan. 18, 1983.

Victor R. Arditti, Richard M. Lovelace, El Paso, for appellant.

Steve W. Simmons, Dist. Atty., and R. Bradford Stiles, Asst. Dist. Atty., El Paso, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

DALLY Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

The appellant contends that the trial court erred: in overruling his motion for continuance, in overruling his motion to at-tach absent venire members, in permitting an incompetent witness to testify, in allowing the State to question the incompetent witness by asking her leading questions, and in refusing to submit the third punishment issue of Art. 37.071, V.A.C.C.P. to the jury. Also, the appellant complains of six instances of allegedly improper jury selection.

The appellant was convicted for the murder of Oscar Martin Frayre. The evidence establishes that in the early morning hours of June 20, 1980, the appellant entered a closed gas station in El Paso and robbed and fatally shot Frayre, a mechanic at the gas station. Frayre, who had been staying overnight in the quarters provided for him in the back of the gas station, was shot three times. Lucila Sanchez, a friend of the appellant, was present outside the gas station during the commission of the offense and she testified against the appellant at trial. The sufficiency of the evidence is not challenged.

The appellant first complains of the overruling of his motion for continuance. The motion urged that appointed counsel had not been given enough time to investigate and prepare for trial. The granting or denial of a motion for continuance is vested in the sound discretion of the trial court, and reversal of a judgment is justified only when it is shown the trial court has abused its discretion. *Corley v. State*, 582 S.W.2d 815 (Tex.Cr.App.1979); *Ashabranner v. State*, 557 S.W.2d 774 (Tex.Cr.App.1977); *Nelson v. State*, 505 S.W.2d 271 (Tex.Cr. App.1974); *Bryant v. State*, 423 S.W.2d 320 (Tex.Cr.App.1968).

The record in the present case shows that other counsel had been first appointed to represent the appellant, but on August 15, 1980, the two attorneys who tried the case and who now represent the appellant on appeal were appointed. The case was set for trial on September 8, 1980. Although this is a relatively short time for preparation in a case where the State is seeking the death penalty, no specific, serious matter has been raised by the appellant

and the record does not otherwise show that the appellant's defense was prejudiced by counsel not having more time to prepare for trial. We find no abuse of discretion in the trial court's action. Furthermore, since the appellant himself did not want a continuance he did not sign the motion for continuance as required by Art. 29.08, V.A.C.C.P., and for this reason nothing is presented for review. *Kemner v. State*, 589 S.W.2d 403 (Tex.Cr.App.1979); *Zanders v. State*, 515 S.W.2d 907 (Tex.Cr.App.1974); *Ikner v. State*, 468 S.W.2d 809 (Tex.Cr.App.1971).

■ Complaint is next made that the appellant's motion to attach absent veniremen was erroneously overruled. In *Brown v. State*, 475 S.W.2d 938 (Tex.Cr.App.1971), it was said:

"Appellant relies upon Article 35.01, V.A.C.C.P., to support his claim that the court erred in refusing his motion for attachments to issue against absent prospective jurors who had been summoned and not properly excused from jury duty. The statute is directory, not mandatory, and any failure of the court to observe a literal compliance will not constitute reversible error in the absence of a showing of injury."

The appellant in the instant case has failed to show any injury resulting from the trial court's action in overruling the motion. This ground of error is therefore overruled. See *Stephenson v. State*, 494 S.W.2d 900 (Tex.Cr.App.1973); *Dent v. State*, 504 S.W.2d 455 (Tex.Cr.App.1974); *Moreno v. State*, 587 S.W.2d 405 (Tex.Cr.App.1979).

In his next two grounds of error, the appellant asserts that the trial court erred in permitting Lucila Sanchez, who he says was an incompetent witness, to testify and in permitting the State to ask her leading questions over objection.

■ The record discloses that Lucila Sanchez was 24 years old and a high school graduate of 1975; she attended special education classes in high school. It is apparent from the record that it was difficult for her to articulate in English certain responses to questions and that many questions had to

be rephrased before she understood them. Nevertheless, she answered all the questions, her answers were understandable, and her answers reflect an ability to observe intelligently the events in question.

The issue of a witness' competency is a question for the trial court, and its ruling will not be disturbed on appeal unless an abuse of discretion is shown by a review of the entire record, including the witness' trial testimony. *Watson v. State*, 596 S.W.2d 867 (Tex.Cr.App.1980); *Villarreal v. State*, 576 S.W.2d 51 (Tex.Cr.App.1978); *Clark v. State*, 558 S.W.2d 887 (Tex.Cr.App.1977); *Provost v. State*, 514 S.W.2d 269 (Tex.Cr.App.1974); *Melton v. State*, 442 S.W.2d 687 (Tex.Cr.App.1969). We conclude from a review of Lucila Sanchez's trial testimony that the court did not abuse its discretion in permitting her to testify.

■ Complaint is also made of the trial court's action in permitting the State to ask Lucila Sanchez certain leading questions over the appellant's objections. This was a matter within the sound discretion of the trial court. Unless a defendant can show that he was unduly prejudiced by virtue of such questions, no reversal of his conviction will result. *Navajar v. State*, 496 S.W.2d 61 (Tex.Cr.App.1973); *Ortega v. State*, 493 S.W.2d 828 (Tex.Cr.App.1973); *Uhl v. State*, 479 S.W.2d 55 (Tex.Cr.App.1972); *Linton v. State*, 171 Tex.Cr.R. 213, 346 S.W.2d 320 (1961). As one of the exceptions to the rule excluding leading questions, it has been said that leading questions may be permitted when the witness has difficulty in understanding the English language. See Ray, Texas Evidence, Sec. 578 at 534 (3d ed. 1980).

■ The record in the instant case discloses that Lucila Sanchez had difficulty in understanding certain questions and in articulating certain responses in the English language. In some instances, the court's interpreter was used. In other instances, leading questions were allowed. We find no error in the court's actions, especially since substantially the same testimony, elicited through leading questions, was obtained from Lucila Sanchez in response to ques-

tions by the appellant's counsel on cross-examination; the appellant was not prejudiced by virtue of the leading questions. See *Ortego v. State,* supra; *Davis v. State,* 100 Tex.Cr.R. 617, 272 S.W. 480 (1925); *Dave Lehr, Inc. v. Brown,* 58 S.W.2d 886 (Tex.Civ.App.—Waco, 1933).

The appellant next asserts that the trial court erred in refusing his request to submit the third punishment issue to the jury. Art. 37.071, V.A.C.C.P., provides that at the punishment stage of a capital murder trial and upon conclusion of the presentation of the evidence, "the court shall submit the following issues to the jury:

"(1) . . . .

"(2) . . . .

"(3) *if raised by the evidence,* whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." [Emphasis added.]

In urging that the third punishment issue was raised by the evidence, the appellant in his brief says, "The evidence to which we make reference in the instant case is testimony that appears in several places in the Statement of Facts to the effect that sounds of a fierce struggle were heard from inside the filling station a moment before the shots were heard. Voices raised in argument were also heard, according to the testimony of Lucila Tercero Sanchez. It is reasonable to draw the inference from this that the decedent was putting up some kind of resistance to whatever was being done to him, and this before he was fatally injured, or injured at all."

According to the appellant's brief, "sounds of a fierce struggle were heard from inside the filling station a moment before the shots were heard." The appellant, however, does not cite us to any evidence in the record to support his contention. Our review of the record discloses that other than loud voices, the only "sounds" heard coming from inside the gas station were sounds of tools falling on concrete. This is not evidence of a fierce struggle. And although the evidence supports the appellant's contention that Lucila Sanchez heard the appellant and Frayre exchanging words in a tone of voice that sounded as if they were arguing, the only words she could discern were the appellant saying, "Paso el dinero," and Frayre responding, "No tengo dinero yo." When asked for the English translation, the court's interpreter stated that "paso el dinero" meant "pass the money or hand over the money" and "no tengo dinero yo" meant "I do not have any money."

 In order to raise the issue of provocation, it is necessary that there be evidence of the deceased's conduct just prior to his death; also, that evidence must be sufficient to be considered provocation. The loud voices heard by Lucila Sanchez in this case together with the sounds of tools falling on concrete are not evidence of Frayre's conduct; they do not show that Frayre may have provoked the appellant to kill him. Therefore we are unable to conclude from our review of the record that the evidence raises the issue of provocation; we also decline the appellant's invitation to infer "that the decedent was putting up some kind of resistance to whatever was being done to him." See and compare *Evans v. State,* 601 S.W.2d 943 (Tex.Cr.App. 1980). Moreover, at the punishment stage of the trial the appellant did not present any evidence in an attempt to raise the issue of provocation. The appellant, against the advice of his own counsel, testified, but he did so only to request that the jury sentence him to death.

The appellant next complains of six instances of allegedly improper jury selection. In the first of these instances the appellant urges that the trial court erred by excusing venireman Chavez over the appellant's objection. This 59 year old venireman stated that he had a sick mind, pneumonia, and heart trouble, and that he was on medication. Chavez further expressed doubt about his physical ability to serve on the jury. The trial court excused Chavez on its own motion.

 A trial court should not on its own motion excuse a venire member on

grounds which do not show an absolute disqualification. See Art. 35.19, V.A.C.C.P.; *Esquivel v. State,* 595 S.W.2d 516 (Tex.Cr.App.1980); *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978); *Valore v. State,* 545 S.W.2d 477 (Tex.Cr.App.1977). Chavez would have been subject to a challenge for cause under Art. 35.16(a)(4), V.A.C.C.P., on the ground that he had "such bodily or mental defect or disease as to render him unfit for jury service. . . ." The appellant has not shown how he was harmed by the exclusion of Chavez nor has he established that he was tried by a jury to which he had a legitimate objection. *Esquivel v. State,* supra; *Bodde v. State,* supra; *Valore v. State,* supra; *Henriksen v. State,* 500 S.W.2d 491 (Tex.Cr.App.1973). Furthermore, that the trial court excused Chavez on its own motion when he was not challenged for cause by the State is not an issue in this case since the appellant did not object on this ground. See *Bodde v. State,* supra; *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976). We conclude that the trial court did not abuse its discretion by excluding Chavez. See and compare *Redd v. State,* 578 S.W.2d 129 (Tex.Cr.App.1979); *Villarreal v. State,* 576 S.W.2d 51 (Tex.Cr.App.1978); *Bodde v. State,* supra.

■ Next, the appellant complains that venireman Jose A. Gomez was erroneously excluded for cause over the appellant's objection. This venireman showed that he would not consider the entire range of punishment provided by law; therefore, he was subject to challenge for cause under Art. 35.16(b)(3), V.A.C.C.P., on the ground that he had "a bias or prejudice against [a] phase of the law upon which the State is entitled to rely for conviction or punishment."

During voir dire examination by the prosecutor, venireman Gomez expressed his bias against the minimum punishment for the lesser included offense of murder and unequivocally stated that he was unable to consider such punishment in a murder case. The State challenged Gomez for cause. Thereafter, the appellant's counsel sought to rehabilitate Gomez by demonstrating the wide range of fact situations that may fall within the murder statute. The trial court then intervened to ask:

"THE COURT: Now, Mr. Gomez, again I am not criticizing you. You told us two different things. You told the District Attorney you couldn't conceive of a murder case where you felt like five years punishment was in order; do you recall saying that?

"A. Yes, I do.

"THE COURT: Now, you told the defense attorney you could conceive of one where you felt five years would be in order; which is it please?

"A. If I can say something. He said to think of a certain case. What if it's self-defense?

"THE COURT: If it's self-defense, you wouldn't find the man guilty.

"A. They could have been fighting or something.

"THE COURT: Again, I will ask you as everybody else has, and we are entitled to know whether you could consider the full range of punishment for the offense of murder which starts at a low of five years and goes on up to a possible ninety-nine years or life. That's the range of punishment. Is that understood, Mr. Gomez?

"A. Yes, sir.

"THE COURT: Well, could you conceive of a case, I'll ask you again, where your conscience would permit you to consider five years as punishment for murder?

"A. No.

"THE COURT: All right. You are disqualified. You will be excused. You are excused, sir.

"[DEFENSE ATTORNEY]: For the record, may we have an objection to that, Your Honor.

"THE COURT: Sure."

We find no error in the trial court's exclusion of Gomez; his answers certainly reflect a bias against the minimum punishment. See *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978); *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976). Further-

more, the appellant has not shown that he was tried by a jury to which he had a legitimate objection. See *Henriksen v. State,* supra.

■ In four grounds of error, the appellant also complains that the trial court erred by excluding venire members Michael Knapp, Virginia Gonzales, Charlotte Smith and Frances Bradley "on grounds of inability to consider imposition of the death sentence." This case was tried after the decision of the Supreme Court in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); our review consists of determining whether any of the venire member's exclusions were inconsistent with *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The appellant first complains of the trial court's action in excusing venireman Knapp. When the prosecutor asked Knapp whether he could think of any case in which he could consider sentencing another human being to death, Knapp answered in the negative and added that nothing would change his mind. The prosecutor then challenged Knapp under *Witherspoon.* Thereafter, counsel for the appellant attempted to rehabilitate Knapp but Knapp never equivocated in his opposition to the imposition of the death penalty; he continued to answer that he would never sentence another human being to death. We find that Knapp's exclusion was consistent with *Witherspoon.* Compare *Russell v. State,* 598 S.W.2d 238 (Tex.Cr.App.1980); *Brandon v. State,* 599 S.W.2d 567 (Tex.Cr.App.1980); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979); *Granviel v. State,* 552 S.W.2d 107 (Tex.Cr. App.1976).

The appellant next directs our attention to the examination of venire members Gonzales, Smith and Bradley. We will set out the pertinent portion of each of these examinations.

During voir dire examination by the prosecutor, Virginia Gonzales was asked:

"Q. Is your opposition to the death penalty so strong inside of you that no matter what the facts were in any kind of criminal case, no matter how horri-

ble the facts might be, because you feel the way you do, you could never vote in such a way that another person would receive the death penalty; is that what you are telling me?

"A. That's true.

"THE COURT: Speak up loudly.

"A. Yes, Your Honor.

"Q. So, no matter what the crime is, you could never vote for the death penalty because that's the way you feel?

"A. That's true.

"Q. No matter what the evidence, you have to vote against the death because of the way you feel inside?

"A. That's true.

"Q. There is nothing I can say to change your mind, is that correct?

"A. That's correct.

"Q. And there is nothing the Defense lawyers can say to change your mind?

"A. That's correct.

"Q. And there is nothing that the Judge can say to change your mind, is that correct?

"A. That's correct.

"[PROSECUTOR]: Thank you, ma'am. I challenge under *Witherspoon,* Your Honor."

In subsequent questioning by the appellant's counsel, Gonzales seemed to equivocate, leading the trial court to ask:

"THE COURT: Let me ask you again so we can get it definite. Are there some cases in which your conscience would permit you to vote for the death penalty?

"A. I don't know.

"THE COURT: Ma'am.

"A. I don't know. I am confused. I am very confused.

"THE COURT: Well, I don't think what I am asking you is very confusing, now, is it? Are there some situations that would enable you to conscientiously vote for the death penalty; do you understand what I am asking?

"A. Yes, Your Honor.

"THE COURT: How do you answer?

"A. No.

"Q. You can't conceive of any? You can't think of anything that would permit you conscientiously to vote for the death penalty?

"A. No, sir."

Continued questioning by the court seemed to confuse Gonzales and the court thereafter asked the following series of questions:

"THE COURT: I'm going to ask you again. Try to understand me because it is really not too difficult. You know what the death penalty is?

"A. Yes, Your Honor.

"THE COURT: Now, we are here today, we are trying to get jurors, that's what you are doing here to sit on this case. They have to be fair and impartial both to the State and to the Defendant. Now, it is possible that in this case, the death penalty could be assessed. So, we are asking you, Mr. Weiser, Mr. Lovelace, and myself, how you feel about the death penalty? That's what we are asking. Okay. Now, are you following me so far?

"A. Yes, uh-huh.

"THE COURT: Now, you told Mr. Weiser before and I'm going to ask you again, are you opposed to the death penalty as a punishment for crime?

"A. Well, at the time I didn't understand. I didn't understand.

"THE COURT: I don't care what you understood at the time. You answer me now, please.

"A. If he did something wrong, yes.

"THE COURT: If what?

"A. What I meant was if he did something wrong, of course, he has to be punished for what he did.

"THE COURT: I guess we would all agree with that. I'll get back to the question again. Do you think that Virginia Gonzalez, that's you, isn't it?

"A. Yes.

"THE COURT: Could you ever vote to send a man to his death?

"A. No, I don't think so.

"THE COURT: This juror will be excused under the doctrine of *Witherspoon*. You have your objection and exception. Thank you, ma'am. You will be excused."

Venire member Charlotte Smith was at first equivocal in stating her position on capital punishment. She did not know whether she could consider the death penalty under the appropriate facts. The prosecutor then explained the procedure followed under Art. 37.071, V.A.C.C.P., and towards the end of the voir dire examination asked Smith:

"Q. Are you telling me then no matter what the instructions were from the Court, your feelings inside—you have a right to disagree with the law. Because we live here, we have the right to disagree with the law. Are you telling me your feelings inside would say to you no matter what the facts are I hear in this case or in a case of capital murder, I would either have to answer one of those questions no or refuse to answer the question because I don't want the person to be executed? If that's the way you feel, that's fine. If you don't feel that way, then tell me.

"A. I don't know. I don't know how to answer you.

"THE COURT: Well, Mrs. Smith, let me ask you this: You have told us you have a deep feeling against the death penalty?

"A. That's right.

"THE COURT: Isn't that what you said?

"A. Yes.

"THE COURT: All right. Let me make it simple. Could you ever sit on a jury and vote in such a way that a man would be executed?

"A. I don't think so.

"THE COURT: All right.

"Q. When you say I don't think so, you mean you could not do that, is that correct?

"A. That's right.

"[PROSECUTOR]: I pass on *Witherspoon* and challenge on that point."

Further examination of Smith by the appellant's counsel reveals the following:

"Q. Mrs. Smith, can you think of no crime that is so damaging to society or to the individual against whom it is done that the person who did it should die for it?

"A. No, I don't think I do.

"Q. No crime.

"A. No.

"Q. Not even to someone's children or someone who is very helpless and dear to someone else, babies?

"A. Well, that depends if somebody is sick and do something like that, you know what I am saying?

"Q. Mentally ill?

"A. Mentally ill, mentally sick, then it isn't right but then there is an excuse.

"Q. But suppose someone were not mentally ill or at least not in the sense the law deals with that subject, or just is sane as a dollar, just really nasty, just a really bad person, but not mentally ill and does some really horrible thing?

"A. Well, if there is no help for anybody anymore, I guess the law has to do something about it.

"THE COURT: Let me interrupt you here. You told us several times you are so against the death penalty you could not vote for it?

"A. Yes, that's right.

"THE COURT: Now, which is it? Is that what your feeling is?

"A. That's what my feeling is. If somebody proved to me that somebody would do it over again, then I am really not sure of myself.

"THE COURT: I don't understand what you are talking about now. Are you so against the death penalty that you could not vote to send a man to death under any circumstances? How do you feel about that.

"A. Under any circumstances?

"THE COURT: That's what I asked you before.

"A. I just don't feel it is my place to put anybody to death.

"THE COURT: You will be excused, ma'am. Thank you very much."

Like Smith, venire member Frances Bradley was at first equivocal in her answers concerning capital punishment, leading the trial court to ask:

"THE COURT: Are there some circumstances or can you conceive of some cases in which your conscience would permit you to vote for the death penalty?

"A. No, I don't think so. I will be honest with you. I don't think I could.

"THE COURT: We are not being critical of any attitude you may have but we do have to know this.

"A. The only way I could see a death penalty was if it was a child or minor that couldn't protect themselves or it was caused—they intended to do it, you know what I mean?

"THE COURT: In our State, you couldn't hardly find a person guilty of murder unless you found that they intentionally committed the act. That's part of the very definition of murder. Well, now, at the risk of repeating myself and boring you, do you think of any case or any situation grave enough in your mind which would permit you, Mrs. Bradley, to vote for the death penalty?

"A. No, I don't think so.

"THE COURT: Now, are you firm in that answer, ma'am?

"A. I guess, yes."

In subsequent questioning by the appellant's counsel, Bradley seemed to again equivocate. The trial court then asked:

"THE COURT: You told us about three different things, now, which is understandable but not very helpful.

"A. I just don't think, to tell you the truth, I would be very good on a murder trial.

"THE COURT: We are trying to find out one little thing. We want to know if Frances Bradley could sit on that jury or a jury and work together with eleven other jurors in any case she

might conceive and write a death penalty that would spell finish to some old boy. Now, can you do it or can't you?

"A. No, I don't think I can. I don't think I would be good on a jury.

"THE COURT: It's not whether you would be good or not.

"A. I don't think I can make the decision.

"THE COURT: Whether you can or could not?

"A. I don't think I can."

A continued examination by the appellant's counsel further reveals the following:

"Q. I am not suggesting it is an easy decision. I am not suggesting that the proponents and opponents of the death penalty don't have a good argument. They do, I think, but in as far as the way you are, you say in the case of a grave crime that offends you very much such as child killing, intentional child killing or any other intentional planned, done type killing, are you telling us you are not sure that you can or that you cannot?

"A. Well, I would say that I don't believe I could make the decision for a person's death.

"Q. Which means not sure?

"A. That's right.

"THE COURT: Which means to me I'm going to excuse you. Thank you, Mrs. Bradley. You will be excused."

■ This Court has previously recognized the troublesome area of the "equivocating venireman," and we have held that *Witherspoon,* supra, does not require specific formalized answers. *Brandon v. State,* supra; *Villarreal v. State,* supra; *White v. State,* 543 S.W.2d 104 (Tex.Cr.App.1976); *Tezeno v. State,* 484 S.W.2d 374 (Tex.Cr. App.1972). See also *Hughes v. State,* 563 S.W.2d 581 (Tex.Cr.App.1978); *Granviel v. State,* supra. With only a "cold" record before us, it is difficult to say in many instances whether certain venire members are unequivocally committed to vote against imposition of the death penalty. Certainly the trial judge, who is present to hear the tone of voice and observe the demeanor of the venire members as they answer questions, is better situated to determine whether a particular venire member is in fact unequivocally committed to vote against imposition of the death penalty. In the absence of an abuse of discretion, we should not disturb the trial court's ruling, especially if at the very least, serious doubt is cast on the ability of a venire member to be a fair and impartial juror. *Villarreal v. State,* supra; *Granviel v. State,* supra; *Tezeno v. State,* supra.

Reiterating what was said in *White v. State,* supra, about the troublesome area of the "equivocating venireman," we adhere to the following statement from *Tezeno v. State,* supra:

"We cannot believe that *Witherspoon v. Illinois,* supra, requires certain formal answers and none other. We surely feel that the test of *Witherspoon* is 'not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality.'

"We are aware of a large number of death penalty cases which have recently been reversed in memorandum opinions by the United States Supreme Court[3] [Footnote 3 citing cases omitted]. While it is difficult, if not impossible to synthesize a rule from those opinions, we have concluded that the voir dire in the instant case and answers of the veniremen are more unequivocal than those which were set forth in the cases which have been reversed."

After a careful consideration of the record before us, we conclude that the trial court's decision to exclude Gonzales, Smith and Bradley from the jury was consistent with *Witherspoon;* their answers reflect that each would have been unable to serve as fair and impartial jurors consistent with *Witherspoon.* See and compare *Villarreal v. State,* supra; *Granviel v. State,* supra; *White v. State,* supra; *Moore v. State,* supra; *Tezeno v. State,* supra.

We recognize and give due deference to the trial judge's discretion; to not properly respect the trial court's discretion would

constitute a failure to recognize and understand the realities of the voir dire of jurors. The trial judge's interpretation of the jury voir dire in the instances of which complaint has been made does not show an abuse of discretion.

 Additionally, the appellant in oral argument urged that each of these venire members was erroneously excused because the State did not challenge them for cause. The record, however, reflects that only venire member Bradley was excused on the Court's own motion; the other three venire members were challenged for cause. That the Court excused Bradley on its own motion does not present an issue in this case since no objection on this ground was made in the trial court when Bradley was excused. *Moore v. State,* supra; *Hughes v. State,* 562 S.W.2d 857 (Tex.Cr.App.1978). All four grounds of error are overruled.

The judgment is affirmed.

CLINTON, Judge, dissenting.

The focus of my concern in this case is on the methodology of the majority in disposing of appellant's grounds of error four through seven. Therein the appellant complains of the exclusion of venire-members Michael Knapp, Virginia Gonzales, Frances Bradley and Charlotte Smith; though the

1. Bradley was not challenged by the State; indeed, in passing her the prosecuting attorney expressly declined to make one.

2. *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). (Hereinafter cited as *Witherspoon.*)

3. See Article 35.16(b)(3), V.A.C.C.P. The accused is provided a similar challenge for cause by *id.* (c)(2). When applied to a capital case in which the jury does determine whether the penalty shall be imprisonment or death, according to *Witherspoon,* "The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." *Id.,* 391 U.S. at 522, n. 21, 88 S.Ct. at 1777, n. 21 (Emphasis by the Supreme Court).

4. To seven of the prosecutor's ten questions, Smith "honestly didn't know" how she felt.

State's asserted basis for its entitlement to the exclusion for cause of Knapp, Gonzales and Smith,[1] was their disqualification "under *Witherspoon,*"[2] it is appropriate that we construe each to have been made in fact, because the State believed the prospective juror had "a bias or prejudice against [a] phase of the law upon which the State [was] entitled to rely for ... punishment,"[3] since "it is clear beyond preadventure that *Witherspoon* is not a ground for challenging any prospective juror." *Adams v. Texas,* 448 U.S. 38, 47, 100 S.Ct. 2521, 2527, 65 L.Ed.2d 581 (1980). (Hereinafter cited as *Adams.*)

Indeed, I believe the State established its entitlement to the exclusion for cause of venireman Knapp, for his answers revealed he would be unable to be a fair and impartial juror in deliberating the issues to be submitted at punishment. *Adams; Vigneault v. State,* 600 S.W.2d 318 (Tex.Cr. App.1980). Further, I am willing to agree with the majority that venirewoman Smith was a classic "equivocating veniremember,"[4] and because the thrust of her voir dire examination as a whole reveals her to be irrevocably committed against imposition of the death penalty, I concur in overruling the ground of error complaining of her exclusion.[5]

She "didn't think" she could think of a crime so damaging to society or the victim that the actor should die for it. The closest Smith got to saying the death penalty might be appropriate in some cases, was "well, if there is no help for anybody anymore, *I guess the law has to do something about it;*" of course, this too, is painfully ambiguous. (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

5. My conclusion in this regard, however, has not been reached without reservation. The record reflects that after the prosecutor posited his questions and challenged Smith for cause, defense counsel elicited Smith's doubts that she could think of a crime so damaging as to justify the death penalty; he then gave her a hypothet regarding the victim being a child or baby. Smith's reply indicated she thought the perpetrator of such a crime would have to be mentally ill. Defense counsel negated this contingency in his hypothet and Smith gave the response about guessing "the law has to do something about it." (See n. 3, *ante.*)

However, my review of the record reveals no insidious feature of venirewoman Bradley's voir dire examination which would require the Court's deference to a trial judge's exclusion of an apparently qualified juror without challenge by either party, and over an acknowledged objection by the defense. I cannot agree that a trial judge's discretion extends this far.

Contrary to the majority opinion's assertion that Bradley "was at first equivocal in her answers concerning capital punishment," the record reveals that Bradley approved of the death penalty "depend[ing] on the circumstances;" neither was she "unalterably opposed to the death sentence as a punishment for [some crimes]." However, the trial court interrupted Bradley's first response in this vein with,

> "Well, would your conscience permit you under some circumstances, ma'am, *to vote for* the imposition of death?"

Bradley replied that, to be truthful, she would have to answer "no." Then, after stating to the court that she was not unalterably opposed to the death penalty for some crimes, she added, "Now, I don't know if that's a very good answer." The trial judge replied,

> "Well, it isn't but *it's a bad answer because it conflicts with your other answer.*"

It seems rather clear to me that Bradley was asserting a belief in the viability of capital punishment in the appropriate case,

At this point, after only five questions from defense counsel, the trial judge interrupted with the following:

"THE COURT: Let me interrupt you here. You told us several times you are so against the death penalty you could not vote for it?
A: Yes, that's right.
THE COURT: *Now, which is it?* Is that what your feeling is?
A: That's what my feeling is. *If somebody proved to me that somebody would do it again, then I am really not sure of myself.*
THE COURT: *I don't understand what you're talking about now.* Are you so against the death penalty that *you could not vote* to send a man to death under any circumstances? How do you feel about that?
A: Under any circumstances?
THE COURT: That's what I asked you before?

while expressing a doubt as to her personal ability "to vote for the imposition of death," a fairly common juxtaposition of attitudes which I would not characterize as "conflicting" or "equivocal."

The majority opinion sets out the trial court's continued interrogation wherein Bradley reiterated her doubts about her ability "to vote for the death penalty," while standing firm on her belief that it would be appropriate "if it was a child or minor that couldn't protect themselves or it was caused—they intended to do it, . . . ." But the majority opinion omits the conclusion of what was originally the prosecutor's examination:

> "THE COURT: All right. You may examine further, if you wish.
> [PROSECUTOR]: We pass on that issue.
> [DEFENSE]: *You are not imposing a challenge?*
> [PROSECUTOR]: *No.*"

Apparently the majority opinion labels any response or group of responses which reveal Bradley to be a qualified capital juror as "equivocation;" illustrative is the following exchange which is not otherwise alluded to by that opinion:

"[By Defense Counsel]
Q: * * * In such a case, the killing of a child, the intentional killing of a child, *could you vote for* the death penalty in that case if you were on the jury?
A: *Yes, I think I could then.*

A: *I just don't feel it is my place to put anybody to death.*
THE COURT: *You will be excused, ma'am.* Thank you very much."
This interruption of defense counsel's cross voir dire of Smith and the virtual *sua sponte* dismissal of her by the trial court constitute a risky undertaking in terms of the "method of jury selection" condemned in *Witherspoon.* See especially the venirewoman who twice said she would not want or like "to be responsible" for "deciding somebody should be put to death," *id.*, 391 U.S. at 515, 88 S.Ct. at 1773; the Supreme Court scotched an assumption that such a prospective juror "thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him," *id.*, at 516, n. 9, 88 S.Ct. at 1774 n. 9. Here, however, Smith's last expression does not negate her earlier affirmations.

Q: Now, that's not what we have here but nevertheless, ... are there ... other intentional killing circumstances where *you could, if the circumstances were such that ... it would be justified, vote for the death penalty?* As an example, a killing, an intentional killing while another crime is going on.

A: That's what I said. That's the only way I could say, *I could vote for a death penalty* is if it was an intentional thing or minor that couldn't protect themself [sic]."

Defense counsel at this point reminded Bradley that all murders would have to be intentional, asking her if she understood, and on her affirmative reply, stated, "All right. We are limiting this to intentional killings;" and on asking her again whether she could "vote for the death penalty" if the "circumstances [were] severe or revolting or shocking enough," she replied:

"I feel like I am contradicting myself. *In some cases I feel like I could if I knew all the evidence.* I feel like the death penalty is pretty strong."

Whereupon the trial judge interrupted, observing, "Yes, it is kind of final Mrs. Bradley," again stressing the urgency that the court "get a definite commitment, which is not easy for you to make. I don't imagine you sit around and drink tea everyday and discuss the death penalty." The trial court then again elicited from Bradley that her "conscience [would] permit [her] ... to vote for the imposition of the death penalty ... if it was one of those two cases." The trial court continued:

"THE COURT: You told us—

A: I know I said yes and no.

THE COURT: You told us about three different things, now, which is understandable but not very helpful.

A: *I just don't think,* to tell you the truth, *I would be very good on a murder trial.*

THE COURT: *We are trying to find out one little thing.* * * * [*Can Frances Bradley* sit on] a jury and work together with eleven other jurors in any case she might conceive and *write a death*

*penalty that would spell finish to some old boy.* Now can you do it or can't you?"

Mrs. Bradley again expressed doubts about her ability to "write a death penalty." When passed back to defense counsel Bradley conceded "part of me says I could and part of me says I couldn't." Her voir dire examination was concluded thus,

"A: Well, I would say that I don't believe I could make the decision for a person's death.

Q: *Which means not sure?*

A: *That's right.*

THE COURT: *Which means to me I'm going to excuse you.* Thank you Mrs. Bradley. You will be excused. Was the Clerk there or not? * * *

BAILIFF: I assume he is.

THE COURT: If he is not, be sure to verify Mrs. Bradley's address. Is that an apartment?

[MRS. BRADLEY]: Yes.

THE COURT: Get the apartment number because we will mail you a check if the clerk isn't there.

*You have objection to my ruling.* You are excused now."

First, it is apparent that the majority opinion errs in concluding no objection was offered to the trial court's action in excluding Bradley without challenge. I am certainly willing to defer to the trial judge's acknowledgement of objection to his ruling which is spread on the face of the record, and believe that defense counsel was entitled to assume this Court would give due deference thereto. Thus, in my view, the trial court committed reversible error when he excluded Bradley *sua sponte* when she was not shown to be absolutely disqualified under Article 35.16(a)(2), (3) or (4), V.A.C. C.P.

But my deepest reservation about the majority opinion concerns the holding that we "give due deference to the trial judge's discretion," without in any fashion explicating acceptable limitations on that "discretion;" how can we determine whether an "abuse of discretion" has occurred when we

have failed to delineate what that discretion entails? While it may be appropriate in some cases to wholly defer to the trial judge's "credibility calls," such should be the case *only* where a careful and faithful review of the cold record fails to communicate to us the "feelings," "beliefs" and "attitudes" held by a capital venireperson regarding the death penalty. The voir dire examination of Mrs. Bradley does not present such a case.

Patently, the trial judge was of the belief that the only issue is whether a prospective juror could "vote for" or "write" a death penalty. Inquiries along other lines—including those suggested by *Witherspoon* —were interrupted and treated as irrelevant by the trial court. In the case of Mrs. Bradley, it was the trial judge who branded her responses as "conflicting," and diverted attempts by the attorneys to clarify her relevant attitudes.

We can only speculate about whether Bradley could "consider" the death penalty fairly and *answer the special issues* according to the evidence, since she was never asked whether she could.[6] What does "vote for the death penalty" mean? Every member of the Court has seen capital voir dire examinations in which a prospective juror states unequivocally that he could "never vote for imposition of the death penalty," only to make an about face when he fully comprehends that jurors in Texas are not called upon to "write a death verdict," but to answer questions according to evidence

so that the trial court can assess the penalty.

Who knows what Mrs. Bradley would have said had she understood the true nature of her "more limited role," *Adams,* supra, 448 U.S. at 46, 100 S.Ct. at 2526.

Neither do we know from the record whether Bradley could have "followed the court's instructions." Again, she was never asked if she could. Had the trial court allowed a full and fair exploration of these crucial areas before taking over the voir dire examination and then dismissing Bradley *sua sponte,* the record would likely show an elaboration of her statement—"In some cases I feel like I could [vote for the death penalty] if I knew all the evidence."

It is most perplexing that the Court fails to condemn such a "method of jury selection," but the explicit legitimation of it as "discretionary" is incomprehensible.

What we do know about Mrs. Bradley, is that she believed the death penalty is an appropriate punishment *in some cases,* but would have some difficulty "writing a death sentence."[7] Now, if we only knew what her understanding of "writing a death sentence" was, we might have sufficient information to justify excluding her.[8] But because we do not, we can only conclude that she was *not* shown to be disqualified, and it was therefore error to exclude her. To grant unlimited power to trial judges to conduct *ex parte* capital voir dire examina-

---

**6.** In light of experience since *Hovila v. State,* 532 S.W.2d 293 (Tex.Cr.App.1975), the premise that "the jury will know that their answers will determine whether the defendant is to be punished by death or by life imprisonment," *id.,* at 294, is not a reliable assumption in voir dire examination. In Texas, "to obey his oath and follow the law," the juror *"must be willing* not only to accept that in certain circumstances death is an acceptable penalty but also *to answer the statutory questions without conscious distortion or bias,*" *Adams,* supra, 448 U.S. at 46, 100 S.Ct. at 2526. That willingness can only be determined from answers to proper questions designed to ascertain it.

**7.** If a majority persists in characterizing such attitudes as "equivocation," then so be it. But "to not properly respect" the sheer consistency

of such attitudes, and require more of the State and the trial court in denotatively refining them, "constitutes a failure to recognize and understand the realities" and complexity of the human psyche.

**8.** There can be no doubt whatever that venirewoman Virginia Gonzales believed that in order to serve on the jury she was required to *precommit* to the trial judge that she *would* vote for the death penalty. Her misunderstanding is completely understandable in view of the manner in which the voir dire was conducted throughout this case. Though she too was never shown to be disqualified, Bradley's improper exclusion alone requires reversal of the case. *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 399 (1976).

tion on an improper criterion[9] and then make *sua sponte* exclusions, is perhaps the most dangerous way the Court has taken to date, along a mighty thin line.[10]

I dissent.

ONION, P.J., and ROBERTS and TEAGUE, JJ., join.

## ON APPELLANT'S MOTION FOR REHEARING OVERRULED WITHOUT WRITTEN OPINION

TEAGUE, Judge, dissenting.

Appellant contends on rehearing that this Court erred in its original opinion when it upheld the trial court's exclusion of venireperson Francis Bradley,[1] which exclusion occurred on the trial court's own motion. Because I find that the majority erroneously overrules without written opinion the appellant's motion for rehearing, I must respectfully dissent. The motion should be granted and the judgment of conviction reversed.

On original submission, a majority of this Court held, inter alia, that the appellant had failed to perfect his ground of error that the trial court had erred by excusing Bradley. Nevertheless, the majority also substantively held that Bradley's views were consistent with the constitutional re-

straints set out in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). A careful review of the voir dire examination of Bradley, in conjunction with the law, convinces me that the majority was in error on both holdings, and today it compounds that error by failing to grant appellant's motion for rehearing and reverse the conviction.

The record reflects that the trial judge excused Bradley without the prosecuting attorney manifesting any challenge to Bradley serving as a juror in this cause. In fact, the record reflects that the prosecuting attorney not only did not challenge Bradley serving as a juror in this cause, but affirmatively declined to interpose a challenge to Bradley serving as a juror. The trial court had no legal authority to excuse Bradley on its own motion. It is self-evident under the law of this State that a trial court should not on its own motion excuse a prospective juror for cause—unless that juror is absolutely disqualified for service in a criminal case. See *Esquivel v. State,* 595 S.W.2d 516, 524 (Tex.Cr.App.1980). Also see *Martinez v. State,* 621 S.W.2d 797, 798–799 (Tex.Cr.App.1981), and the cases cited therein; as well as the cases collated in Vol. 25, *Texas Digest* under Jury Key No. 109.

According to the above cases, and Art. 35.19, V.A.C.C.P.,[2] the term "absolute dis-

---

**9.** The writer's conviction that a juror's ability to "vote for" or "write" a death penalty, is immaterial to the ability of that juror to serve fairly and impartially on a Texas capital jury, has been very recently fortified. See *Alderman v. Austin,* 663 F.2d 558 (CA5, 1981).

**10.** That is "the line of neutrality" which the State of Texas, not just the prosecution, is constitutionally forbidden to cross and produce "a jury uncommonly willing to condemn a man to die," *Witherspoon,* supra, 391 U.S. at 520, 521, 88 S.Ct. at 1776.

**1.** The pertinent portions of Bradley's voir dire examination are either reproduced verbatim or adequately summarized in Judge Clinton's dissenting opinion on original submission, and need not be reproduced again in this opinion.

**2.** Art. 35.19, V.A.C.C.P., provides as follows: No juror shall be impaneled when it appears he is subject to the second, third, or fourth cause of challenge in Article 35.16, though both parties may consent.

Art. 35.16(a)(2), (3), (4) provide as follows:

(a) A challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made by either the state or the defense for any one of the following reasons:

(2) That he has been convicted of theft or any felony;

(3) That he is under indictment or other legal accusation

(4) That he is insane or has such defect in the organs of feeling or hearing, or such bodily or mental defect of disease as to render him unfit for jury service, or that he is legally blind and either the court or the state in its discretion or the defendant or the prospective juror in his discretion is not satisfied that he is fit for jury service in that particular case.

Art. 35.16(a) also provides that "No juror shall be impaneled when it appears that he is subject to the second, third or fourth grounds of challenge for cause set forth above, although

qualification" encompasses *only* the second, third, and fourth causes for challenge listed under Art. 35.16(a), V.A.C.C.P. I have carefully reviewed the responses Bradley gave during her voir dire examination and have not found the slightest indication that she was absolutely disqualified for jury service under the provisions of Arts. 35.16 and 35.19, supra. Thus, the trial court should not have excused Bradley sua sponte. I also find that such error was not harmless error because the State had exhausted all of its peremptory challenges prior to the conclusion of jury selection in this cause. And even if it had not, this Court in *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980), in overruling *Chambers v. State,* 568 S.W.2d 313 (Tex.Cr.App.1978), held that the existence of unused State peremptory challenges does not serve to make harmless an erroneous exclusion of a venireperson in a capital murder case.

As to this Court's holding that the appellant failed to make a timely and specific objection to the trial court's excusing Bradley, I find it necessary to discuss the contemporaneous and specific objection rules of law. The contemporaneous objection rule of law is a requirement in law that before a defendant can complain on appeal about some action of the trial court or the prosecuting attorney it is incumbent upon him to make an objection at the very first opportunity—to whatever his complaint refers. See *Boulware v. State,* 542 S.W.2d 677 (Tex. Cr.App.1976), cert. den., 430 U.S. 959, 97 S.Ct. 1610, 51 L.Ed.2d 811 (1977); *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr.App.1981), cert. denied, 452 U.S. 931, 101 S.Ct. 3067, 69 L.Ed.2d 431 (1981); *Zillender v. State,* 557 S.W.2d 515 (Tex.Cr.App.1977); *Sullivan v. Little Hunting Park,* 396 U.S. 229, 233–234, 90 S.Ct. 400, 402–03, 24 L.Ed.2d 386 (1969); *Williams v. Georgia,* 349 U.S. 375, 75 S.Ct. 814, 99 L.Ed. 1161 (1955); *Henry v. Mississippi,* 379 U.S. 443, 447–448, 85 S.Ct. 564, 567, 13 L.Ed.2d 405 (1965); *Engle v. Isaac,* 456 U.S. 107, 102 U.S. 1558, 71 L.Ed.2d 783 (1982); *May v. State,* 618 S.W.2d 333 (Tex.Cr.App.1981), cert. granted, 454 U.S.

959, 102 S.Ct. 497, 70 L.Ed.2d 374 (1982). This rule of law has been applied to capital murder jury selection proceedings. A corollary to the contemporaneous objection rule of law is the requirement that before error is preserved for appellate review purposes, the objection must be specific. This rule has also been applied in capital murder voir dire situations involving exclusion of jurors in the absence of challenge by the parties. *Bodde v. State,* 568 S.W.2d 344, 349 (Tex.Cr. App.1978); *Burns v. State,* 556 S.W.2d 270, 278 (Tex.Cr.App.1977); *Moore v. State,* 542 S.W.2d 664, 668 (Tex.Cr.App.1976).

The reason appellate courts require that an objection must be made as soon as the ground of objection becomes apparent is obvious. The additional requirement that the objection must be specific, in order to properly preserve error for appellate review purposes, stems from two policies. The twofold reason for the rule was succinctly stated in *Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Cr.App.1977). There, this Court stated the following:

> First, a specific objection is required to inform the trial judge of the basis of the objection and afford him the opportunity to rule on it. Second, a specific objection is required to afford opposing counsel an opportunity to remove the objection or supply other testimony. McCormick, Handbook of the Law of Evidence, Sec. 52, p. 113, 115 (2d ed. 1972); 4 Jones, The Law of Evidence, Sec. 28:2, p. 276 (6th ed. 1972).

Also see *Xanthull v. State,* 172 Tex.Cr.R. 481, 358 S.W.2d 631 (1962); *Fowler v. State,* 171 Tex.Cr.R. 600, 352 S.W.2d 838 (1962).

Ordinarily, the responsibility for making a timely and specific objection rests with the complaining party. Failure to timely and specifically object will usually constitute waiver of the objection. However, because the instant case presents a unique situation, I am unable to agree that appellant failed to object or that the objection to the trial court's exclusion of venireperson Bradley was untimely.

both parties may consent. All other grounds for challenge may be waived by the party or

parties in whose favor such grounds of challenge exist."

Although the record does not reveal any manifestation of a defense objection to Bradley's exclusion by the trial court, sua sponte, nevertheless, it instead reflects the trial court's acknowledgment of appellant's objection to the exclusion of Bradley. Prior to excusing Bradley, the trial court stated into the record the following: "You [appellant] have objection to my ruling."

As previously noted, a primary purpose of the specific objection rule is to ensure that the trial court and opposing counsel are informed of the ground of objection so that they possibly can take action to remedy or cure the noted defect or action. Another reason for the specific objection rule is to ensure that the trial court has adequate opportunity to rule on the objection. *Zillender v. State,* supra. In this instance, neither of the above purposes would be served by holding that the appellant did not preserve error in the trial court's wrongful exclusion of the venireperson Bradley. The record makes it apparent to me that the focus of Bradley's voir dire examination was on her views regarding the imposition of capital punishment, and her ability to render a verdict which would result in a sentence of death. As noted, the prosecuting attorney affirmatively declined to interpose a challenge for cause to Bradley serving as a juror. The trial court, nevertheless, sua sponte and without stating any reasons for its action, excused Bradley. However, in doing so, it explicitly stated the following: "You may have objection to my ruling [that is, to the excusing of Bradley]." Under these circumstances, I am able to state that the most apparent defense objection would have been that the trial court excused Bradley in the complete absence of authority to take such action. I therefore believe that under the above circumstances, to further require appellant to have made any additional and synonymous statements that the trial judge had just made would be to mandate that appellant was required to do a useless act. The law ordinarily does not require the doing of a useless act. In light of this record, I am unable to state that the trial court was unaware of a ground of objection; especial-

ly when it was the trial judge himself who took the initiative in noting appellant's objection to his exclusion of Bradley. As Judge Clinton noted in his dissenting opinion on original submission, appellant should be entitled, for appellate review purposes, to rely on the trial judge's acknowledgment of his objection. I would also hold he may do so. I also believe, in light of this record, that it would be quite unfair to the appellant to hold that no error was preserved; especially after the trial judge, in effect, assured appellant that any error in Bradley's exclusion was in fact preserved for appellate review. In light of the action by the trial judge, I believe that to hold the error was not preserved for appellate review would tend to impugn the fairness and integrity of the judiciary. This, I decline to do.

Having previously found that such error was harmful to appellant, I would grant appellant's motion for rehearing and reverse the judgment of conviction for the above stated reasons.

On original submission, the majority implicitly found that the trial judge's acknowledgment of appellant's objection was sufficient to preserve any potential error in reference to his claim that Bradley was improperly excluded in light of *Witherspoon v. Illinois,* supra. The majority, however, held that the trial court's excluding Bradley was "consistent with *Witherspoon;* [her] answers reflect that [she] would have been unable to serve as [a] fair and impartial juror consistent with *Witherspoon.*" I totally disagree with this conclusion. A careful review of the transcription of Bradley's voir dire examination reflects that she was improperly excused under the Supreme Court decisions of *Witherspoon* and *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). The majority's holding is Constitutionally unsound.

The Supreme Court in *Witherspoon,* supra, mandated that "a sentence of death cannot be carried out by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples

against its infliction." 392 U.S. at 522, 88 S.Ct. at 1777, 20 L.Ed.2d 784–785. In *Adams,* supra, the Supreme Court held that V.T.C.A., Penal Code, Sec. 12.31(b), which statute disqualifies a prospective juror who is unwilling to swear that the mandatory penalty of death or life imprisonment for the offense of capital murder will not affect that person's declarations on factual issues in the case, stated a disqualification standard impermissibly broader than *Witherspoon,* supra, and cannot be used as a basis for disqualification independent of *Witherspoon,* supra.

The voir dire examination of Bradley reflects that although she was not unalterably opposed to the death penalty, she did not think that she could "vote for the imposition of death." However, she qualified her answers by first stating that she could "vote for the death penalty" if "it was an intentional thing or a minor that couldn't protect [himself]." Bradley's voir dire examination concluded with the following responses:

> Bradley: Well, I would say that I don't believe I could make the decision for a person's death.
>
> Defense Attorney: Which means not sure?
>
> Bradley: That's right.

At no time during voir dire did anyone ask Bradley any questions concerning the special issues set forth in Art. 37.071, V.A.C.C.P. Bradley's responses also indicate that in the abstract she was unsure whether she could vote to impose the death penalty. Thus, it is conclusive that Bradley did not make it "absolutely and unmistakably clear" that she could not follow the law. The trial judge's excluding her was improper under the guidelines of *Adams,* supra, and *Witherspoon,* supra. For this additional reason, I am compelled to dissent to the denial of appellant's motion for rehearing without any written opinion.

Therefore, for all of the above reasons, I respectfully dissent to the action of the majority in denying the appellant leave to file his motion for rehearing.

ONION, P.J., and CLINTON and MILLER, JJ., join in this opinion.