# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00406-CR

**John Thomas Mendoza Jr., Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF HAYS COUNTY, 22ND JUDICIAL DISTRICT
### NO. CR-05-799, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant John Thomas Mendoza, Jr., appeals his convictions on five separate counts of aggravated sexual assault of a child and one count of indecency with a child. *See* Tex. Penal Code Ann. § 21.11(a)(1) (West 2003), § 22.021(1)(B) (West Supp. 2008). After the jury found him guilty on all counts, the trial court assessed punishment at fifty years' imprisonment and a $10,000 fine on each of the aggravated sexual assault of a child counts and at twenty years' imprisonment and a $10,000 fine on the indecency with a child count. The sentences were made to run concurrently.

**POINTS OF ERROR**

Appellant's brief is difficult to decipher.[1]  We have tried to determine appellant's points of error from the somewhat disjointed and confusing discussion.  Initially, we find the following:

> Point of Error #1:  Although the State represented to trial counsel that it would not present SANE nurse Salley as an expert or attempt to elicit expert testimony through examination of her, the State did both and flagrantly disregarded numerous proper objections and trial court rulings.  Because this was intentional, reversal should be automatic, but the harm was clearly identifiable and the evidence of guilt not overwhelming.  The trial court and trial counsel made a minor error, caused in part by the State's neglect, which also contributed, but should not be used to affirm the conviction.

In a multifarious vein, appellant asserts:  "Point of Error #2:  Improper Leading Questions and prosecutorial Remarks in Examination of A— M— and in Closing."

In what appears to be appellant's third point of error, he asserts:  "Evidence of guilt is not overwhelming."  If there are other points raised by the numerous questions propounded without briefing and in many instances without record page references, we decline to address them under the circumstances presented.  *See* Tex. R. App. P. 38.1(i) (providing that brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to record).

---

[1]  The State points out:  "First, appellant's issues are not properly briefed and are unintelligible . . . ."  Later, the State responds:  "Here, appellant's objection seems to be confusion. The only one that seems to be confused is him and now me because I have to respond to his confusion."

## BACKGROUND

Appellant does not challenge either the legal or factual sufficiency of the evidence to sustain the convictions. Perhaps for this reason, neither party has honored us with a summary of the facts. A statement concerning the facts will place the points of error in proper perspective.

Terri DeLeon, mother of A.M., the complainant, was the outcry witness. DeLeon testified that A.M. had lived with appellant, her father, while DeLeon was in prison for welfare fraud, theft, and injury to a child.[2] DeLeon recalled that A.M. was staying with her in the summer of 2005, while appellant was in a state jail facility in Bartlett. One morning in July 2005, at about 3 a.m., DeLeon was having difficulty getting A.M. to go to bed. A.M. began crying and blurted out that appellant had molested her and described the details. DeLeon telephoned her sister-in-law, Nancy DeLeon, who lived next door. Both of the women then talked to A.M. Terri DeLeon stated that she telephoned some members of the Mendoza family. She then called the San Marcos police department and was told that she needed to file a "police report." DeLeon testified that she did not file a report because she had some outstanding arrest warrants for traffic violations. DeLeon estimated that about fifteen days passed before she reported A.M.'s accusation to the police.

On cross-examination, DeLeon acknowledged that she had written a letter dated June 16, 2005, to Augustine Mendoza, appellant's uncle, asking him not to allow A.M. to be "around" appellant. She could not recall whether A.M.'s outcry was made in June or July 2005. DeLeon admitted that after the outcry, A.M. disappeared or left her house in the company of

---

[2] It appears the injured child was the daughter of Cindy Mendoza, a relative of the appellant. The record indicates that Terri DeLeon had many difficulties with the Mendoza family.

3

Augustine Mendoza and that A.M. began to live with Augustine and his family. DeLeon explained that she repeatedly asked that A.M. be brought home but to no avail. She revealed that she could not pick up A.M. because she was under a protective order preventing her from going to the homes of members of the Mendoza family.

Later, DeLeon reported that with the aid of the Kyle city police, she was able to regain custody of A.M. It was not until September 19, 2005, that she reported A.M.'s outcry to Child Protective Services in Seguin. DeLeon related that she talked to Scott Johnson, a San Marcos police officer, on October 7, 2005, about A.M.'s outcry. She admitted that there was some delay between the outcry and her actual contact with law enforcement authorities.

A.M., who was ten-years-old at the time of the April 2006 trial, testified that she was between seven and eight years old when her father began to molest her.[3] She testified that the abuse first occurred at her great grandmother Patsy's house, then at her grandmother Estella's house, and again at a hotel, where appellant lived with his girlfriend and their two children. She related that appellant had both vaginal and anal sexual intercourse with her. She stated that the intercourse hurt her, that sticky white stuff came out of appellant's private part, and that it got on her body, the bed, and a blanket. On one occasion, she bled and the blood got on her clothes. Appellant threw her clothes in the trash. A.M. further related that appellant would cause her to rub his private parts with her hand, that he would place his private part in her mouth, and that the white stuff tasted nasty. A.M. further testified that appellant would stick his tongue in her private part.

---

[3] The six-count indictment alleged "on or about" dates ranging from July to November 2003.

4

On cross-examination, A.M. admitted that she had practiced her testimony on three separate days before the trial with the prosecutor. She acknowledged that she had talked with and given statements to others in Seguin and San Marcos. A.M. related that at the time of the trial, she had finished the fourth grade and that she was now living with her mother. She explained that after a disagreement with her mother in the summer of 2005, she went to live with Augustine Mendoza and spent some weeks with her grandmother, Estella. A.M. testified that she loved her father and that she had gone to visit him in jail because it was her desire to do so. She identified several letters that she had written to her father in jail while she was living with her grandmother. The letters were introduced into evidence, the latest bearing the date September 10, 2005. In these letters, A.M. told her father that she loved him, asked how much longer he had to serve, and described some of her activities.

A.M. testified that her grandmother never asked her what her father had done to her, but had only told A.M. to tell the truth. A.M. told her grandmother that what she had said was the truth. Her grandmother never inquired about the facts of the abuse.

A.M. reported that at the end of the summer in 2005, she was enrolled in the fifth grade in the Kyle school district by the Mendoza family. One day A.M.'s mother picked her up from school, took A.M. to her home, and later enrolled A.M. in the San Marcos school district. A.M. had been living with her mother since that time. She further related that her mother told her not to contact her grandmother or her uncle Augustine, but admitted that when her mother was not home, she would telephone Augustine.

5

Mary Morgan, custodian of the medical records at the Guadalupe Regional Center Hospital, testified that the records in her possession were the business records of the hospital. Through Morgan's testimony, the State sought to introduce medical records related to A.M.'s examination and treatment. After a lengthy colloquy at the bench and some objections, a page was redacted from the records, which were then admitted without further objection as State's exhibit No. 1. Christina Salley, a sexual assault nurse examiner (SANE) at the hospital, testified that she was present at the examination of A.M. and took a medical history from her on October 10, 2005, which was included in the hospital records that were introduced at trial. Christy Williams, a forensic interviewer with the Children's Advocate Center, conducted an interview with A.M. on September 28, 2005. A tape was made of the interview and was introduced into evidence without objection. Nancy DeLeon also testified and confirmed that Terri DeLeon had contacted her on the night of the outcry and that she had talked with A.M.

Appellant called his uncle, his mother, and his girlfriend, Veronica Garcia, as witnesses before testifying himself. Appellant admitted to prior felony and misdemeanor convictions,[4] but denied that he committed the alleged offenses against A.M., his daughter. Appellant stated that he and Terri DeLeon had never been divorced. Witnesses from his family acknowledged the family's troubled relationship with Terri. Estella Ledesma, appellant's mother, testified that it was in the early morning hours of June 12, 2005, that Terri DeLeon had telephoned her about A.M.'s accusations, not in July. She related that A.M. spent a good part of the summer

---

[4] Appellant testified that he had been convicted of burglary of a vehicle, organized criminal activity in connection with the burglary, and misdemeanor offenses of DWI, driving with a suspended license, and trespass at a women's shelter.

of 2005 with her. She further testified that she had asked A.M. about the accusations and A.M. replied that her mother told her "to say that" and later added that her mother had "put her up" to making the outcry.

Augustine Mendoza, appellant's uncle, testified that Terri DeLeon had contacted him by telephone on June 6, 2005, about the accusations. He stated that later in the summer, he picked up A.M. and took her to live at his house until A.M. later moved to Estella Ledesma's home. On cross-examination, the following exchange took place:

Q.      And are you familiar with [A.M.]'s reputation for truthfulness?

A.      No. She . . . she lies.


### EXPERT WITNESS

In his first point of error, appellant claims that the State presented SANE nurse Christina Salley as an expert and attempted to elicit expert testimony from her when it had represented that it would not do so and "despite objections and court rulings" that Salley not be allowed to testify as an expert witness.

The State did not designate any witness as an expert witness. The record from the pre-trial hearing reflects the following:

[Prosecutor]:          I have a SANE nurse, but that's not an expert. I don't have an expert on this, so that's it.

[Defense counsel]:   And our response to that was as long as that SANE nurse says what her findings were and not what her opinion is, I have no problem with it either.

During trial, the State offered the hospital records regarding A.M. through the testimony of Mary Morgan, custodian of the records. Appellant's trial counsel asked for time to examine the extensive records and apparently "paper-clipped" portions of the records to which he wanted to object. During the discussion of the admission of the hospital records, the name of the next witness, Salley, was mentioned. This diverted the discussion as to Salley's status as an expert witness. The State made clear that Salley had not been designated as an expert witness and would not be called to testify as an expert. The prosecutor pointed out that Salley would testify as to statements made to her by A.M. under an exception to the hearsay rule, testifying only to "what the history was and what she saw when she examined the child." The prosecutor insisted that Salley would not give an opinion about whether the child had been sexually abused. Appellant's counsel replied, "I have no problem with her testifying as to what she did." Counsel indicated, however, that he had a problem with the "history." Eventually, at the conclusion of the colloquy, in response to counsel's objection, the trial court redacted a page of the hospital records. State's exhibit No. 1 was then admitted into evidence without further objection. The "history" of what A.M. told Sally was included in the exhibit admitted. The trial court, however, made clear that appellant had followed the proper procedure and that the State had failed to designate an expert witness so Salley could not testify as such. The trial court ruled that what A.M. told Salley would be admissible under Rule 801(e)(1)(B) of the Texas Rules of Evidence[5] because of the earlier testimony implying that

[5] Rule 801(e)(1)(B) provides:

(e) **Statements which are not hearsay.**

A statement is not hearsay if:

8

the child was a liar and that her story was fabricated while she was under the influence of her mother. To this ruling, there was no objection to preserve error. *See* Tex. R. App. P. 33.1(a)(1)(A).

Salley testified that she became a SANE nurse in 2001 and spoke at some length about her educational background, her employment as a nurse in various capacities, and her attendance at seminars and other continuing education programs.[6] Salley testified that she examined A.M. at the hospital on October 10, 2005, and discussed the procedures used in the examination. She reported that A.M.'s examination was "normal" and that A.M. did not have any sexually transmitted disease. Salley related that it took two hours to obtain the history from A.M. The trial court sustained appellant's objection when the prosecutor asked whether the two hour-period was "usual or unusual." Still later, the record reflects the following exchange on direct examination:

Q: Okay. And you talked earlier about the difference between an acute and chronic exam and the differences between the two. What was [A.M.]'s case?

A: [A.M.]'s was chronic. It happened . . . the last things that happened 30 to 96 hours ago, which is very common for kids . . . .

---

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:

(B) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive.

Tex. R. Evid. 801(e)(1)(B).

[6] Although appellant now contends that the State was attempting to make Salley a "make-shift" expert witness by eliciting her qualifications at length, appellant offered no objection and therefore preserved no error.

Appellant's "unresponsive" objection was sustained and at appellant's request, the trial court instructed the jury to disregard the answer. The matter was not pursued. Salley continued her testimony. When the prosecutor asked, "Okay, can you explain to the jury your knowledge about the hymen and how quickly it heals," The trial court sustained appellant's objection that the question was "asking for an opinion."

Our examination of the facts fails to reveal that Salley testified as an expert witness regarding the behavior of sexually abused children or otherwise. We do not conclude that the State elicited improper testimony from Salley. The "history" was a part of the hospital records admitted into evidence without objection after redaction. In her testimony, Salley read the "history," which she had taken from A.M. and which was already in evidence without objection. The statements were consistent with A.M.'s trial testimony. Further, Christy Williams, a forensic interviewer, made a tape of her interview with A.M. that was admitted without objection. Point of error one is overruled.

**LEADING QUESTIONS**

In his second point of error, appellant complains of improper leading questions in the examination of the child witness and prosecutorial jury argument concerning the same questions. This is a multifarious point of error, which we will nevertheless address.

Rule 611(c) provides in part that "[l]eading questions should not be used on the direct examination of a witness except as may be necessary to develop the testimony of the witness." Tex. R. Evid. 611(c). "The rule clearly contemplates that some leading questions are acceptable at the trial court's discretion." *Wyatt v. State*, 23 S.W.3d 18, 28 (Tex. Crim. App. 2000) (discussing former rule 610(c), now codified as rule 611(c)). Prior to the adoption of the rule and its forerunner,

whether leading questions were permissible on direct examination was a matter within the sound discretion of the trial court. *Id.* An abuse of discretion cannot be demonstrated "unless [appellant] can show that he was unduly prejudiced by virtue of such questions." *Id.* (quoting *Hernandez v. State*, 643 S.W.2d 397, 400 (Tex. Crim. App. 1982)). The adoption of rule 611(c) has not changed this long-standing proposition. *Id.*

In cases dealing with child witnesses, the rule against leading questions is somewhat relaxed. *Clark v. State*, 952 S.W.2d 882, 886 (Tex. App.—Beaumont 1997, no pet.). A prosecutor's leading questions to a child witness on direct examination will seldom be the basis for reversal. *Uhl v. State*, 479 S.W.2d 55, 57 (Tex. Crim. App. 1972).

Here, on redirect examination of the ten-year-old A.M., the prosecutor revisited matters established on cross-examination that A.M. loved her father, the appellant, had visited him in jail, and had written letters to him while she was living with her paternal grandmother. Then the prosecutor asked A.M. four times, "Would you want to go live with him if he got out of jail right now?" Each time the prosecutor received no audible response, although A.M. stated that she understood the question and did not need a "break." Appellant did not object to these questions or to the line of the interrogation on any basis. The prosecutor then inquired, "Do you think if you lived with him that he would do something to you again?" The record then reflects:

| | |
|---|---|
| [Defense counsel]: | Objection. I've sat here all morning through leading questions, Judge. |
| The Court: | Sustained. |
| [Prosecutor]: | Your Honor, she's 10 years old. I think I have to get some leeway to ask her a question. |

11

| The Court: | Well, that's a little bit off of the topic you've been on. That's too suggestive. |

The only complained-of question was never answered, and there was no request for a jury instruction to disregard the question. Appellant obtained all the relief requested.

Appellant further complains, however, that the prosecutor made improper reference to her interrogation of A.M. during the State's argument at the guilt/innocence stage of the trial. The prosecutor argued:

> Do you know what? The one question I couldn't get her to answer? "If your dad got out of jail right now, would you want to go live with him?" She couldn't answer that question. Ask yourself why. Because he's right there and so is the rest of his family. What the heck is she going to say? She loves her Dad. She wants to go live with his mother. She can't answer that question.

There was no trial objection to these statements and no jury argument issue was preserved for review. *See* Tex. R. App. P. 33.1(a)(1)(A). For the first time on appeal, appellant asserts that the prosecutor's argument distorted the meaning of A.M.'s "non-response." Topics within the proper area of jury argument are: (1) summation of the evidence presented at trial; (2) reasonable deductions drawn from the evidence; (3) answer to opposing counsel's argument; or (4) a plea for law enforcement. *Berry v. State*, 233 S.W.3d 847, 859 (Tex. Crim. App. 2007); *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988). On this record, the prosecutor's remarks were within the proper area of jury argument. Because it is without merit, the second point of error is overruled.

12

## LACK OF OVERWHELMING GUILT

We turn to what for convenience we have designated point of error number three. Appellant's brief lists in the Table of contents the heading "III argument," under which is found "Point of Error #1," "Point of Error #2." This contention is labeled, "Evidence of Guilt Not Overwhelming." The argument under this heading is found at the conclusion of the discussion of the second point of error. Appellant does not challenge the sufficiency of the evidence, legally or factually, to sustain the convictions, nor does he brief his contention along these lines. Rather, he asserts that evidence of guilt is not overwhelming. Appellant cites no authorities and does not describe the legal relief to which he is entitled. In support of the contention, appellant presents a rehash of some of the evidence in the light most favorable to himself and derogatory to the State's witnesses. He claims that the charges against him grew out of a battle of control between Terri DeLeon and A.M. regarding bedtime; that the manipulative child used the charges to take control and divert her mother's attention from the chronic issue of bedtime; and that the situation festered in the long-standing difficulties between DeLeon and the Mendoza family. Appellant acknowledges that this was essentially his trial counsel's argument.

The jury is the exclusive judge of the facts and the weight to be given to the testimony. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979). The jury was duly charged on the law. *See* Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). The jury resolved the issues submitted to them by the trial court against appellant. Appellant is entitled to his opinion about whether the guilt was overwhelming, but is not entitled to any relief under the third point of error. It is overruled.

13

The judgments of conviction are affirmed.

_____

John F. Onion, Jr., Justice

Before Chief Justice Law, Justices Henson and Onion*

Affirmed

Filed:   December 4, 2008

Do Not Publish

* Before John F. Onion, Jr., Presiding Judge (retired), Texas Court of Criminal Appeals, sitting by assignment.  *See* Tex. Gov't Code Ann. § 74.003(b) (West 2005).