**Opinion issued May 13, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-11-00415-CR

————————————

**KIA SWANN HARRIS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1274872**

---

## MEMORANDUM OPINION

A jury convicted Kia Swann Harris of aggravated robbery, and pursuant to an agreed recommendation, the trial court assessed his punishment at ten years' confinement in TDCJ. In eight issues, Harris contends that the trial court abused

its discretion when it denied his trial counsel's motion for a continuance and that his trial counsel was ineffective because she: (1) failed to file a pretrial motion to suppress, or otherwise object to, an investigative stop and the subsequent search of a backpack; (2) failed to file a pretrial motion to suppress, or otherwise object to, Farias's unreliable in-court identification; (3) stated "no objection" to the admission of a photo, a bank deposit bag and a deposit slip, thereby waiving all appellate review of the suppression issues in this case; (4) failed to request an article 38.23 instruction to present these suppression issues to the jury; (5) failed to object to Farias's testimony that compared the robbers to "animals" and the State's reference to Harris as an animal during closing argument; and (6) failed to get a ruling on her motion for continuance. Harris also argues that his counsel's performance was deficient as a whole.

We affirm.

## Background

### A. The Robbery

Near midnight as the employees of a McDonald's restaurant were closing and cleaning the storefront, three men vaulted over the cash register counter and robbed them at gunpoint. One of the robbers searched Martha Farias, the closing manager, and took her cell phone and money, while the other two robbers confronted the other two employees, searched them, took their cell phones, closed

2

them up in the restaurant's walk-in freezer and directed them to remain there. Farias was then forced at gunpoint to open the safe in the restaurant's back office. Two of the robbers, including the one who took Farias's money and cell phone, stood behind Farias while she opened the office safe and gave them a bank deposit bag labeled with the restaurant's identification number. Although unable to get a good look at the robbers' faces, Farias recalled one of them was wearing a white shirt and had a silver handgun. After the safe was emptied, Farias was put in the freezer with the other two employees. The three of them waited in the freezer until the robbers departed, and then went to a nearby residence and called 9-1-1.

Neither Farias nor the other two employees were able to provide a detailed description of any of the robbers, other than to say that they were young and black.[1]

Surveillance video from the restaurant documenting the events before, during and after the robbery depicted one of the last customers that night, an African-American man dressed in a fitted white t-shirt, dark pants, a necklace, and dark tennis shoes with white tips, talking on a cell phone and getting a fountain drink about an hour before the robbery.

---

[1] Q (defense counsel) Did you give the police a description of the suspects the night of the robbery?
A (Farias) Yes, we told them that they were three black men, young.

3

The video shows the three men jumping over the counter and confronting Farias. The first wore a white, sleeveless T-shirt, dark pants, white tennis shoes, and a red hat. The second was in a non-fitted white T-shirt, long, dark shorts, white tennis shoes, a black backpack and a black hat. The last one was wearing a dark shirt, tan colored pants, and dark shoes. The man in the black hat with the backpack searched Farias and the one in the red hat pointed his gun at her as she opened the safe. The man in the black hat is shown helping to clean out the safe.

Four days later, during an unrelated traffic incident (appellant's car was parked or idling in the far right lane of a street), Houston Police Department Sergeant Travis Schmidt arrested appellant (driver) and Kevin Krenshaw (passenger) for outstanding traffic warrants. Because there was no one available to take custody of the vehicle and it was not legally parked where it could be left safely, Schmidt had the car towed. Officers Jason Zielonka and Greg Clark inventoried the vehicle and transported Harris and Krenshaw to the city jail.

During the inventory, Clark asked appellant if he needed anything out of his vehicle before it was towed and appellant asked for "my money," and directed Clark to the front pocket of the black backpack in the trunk. After finding several loose bills in the front pocket of the backpack, Clark looked in the main compartment and found a clear, plastic bank deposit bag with the McDonald's logo that had been forcibly ripped open. A deposit slip was still inside.

4

The robbery case was assigned to Harris County Sheriff's Office's Robbery Division Deputy Matthew Ferguson, who obtained a copy of McDonald's surveillance video, assembled a photo array for both Harris and Krenshaw, and met with Farias and the general manager of the McDonalds at Farias's home. After giving Farias the standard admonishments (e.g., she was not obligated to pick anyone out, the person who committed the crime may not be in the photo array, etc.), Farias was shown both photo arrays. Although unable to point anyone out from the first photo array, Farias did, after she watched the surveillance video with Ferguson, identify Harris from the second photo array. Ferguson then told her that she "had done a good job. That that person had the bank deposit in his car."

Ferguson then interviewed Harris and Krenshaw about the aggravated robbery. Harris denied any involvement and told Ferguson that the "stolen evidence" found in his car (i.e., the deposit bag and deposit slip) belonged to a "Gregory." Ferguson testified that his search of a database yielded no one associated with appellant named Gregory and he investigated no further. Krenshaw refused to talk to Ferguson. After reviewing the surveillance video, Ferguson concluded that the backpack from appellant's car looked like the one used in the robbery.

Based upon her review of the surveillance video, her opinion that Harris was the man on the cell phone that she served an hour before the robbery, and the fact

5

that Harris was wearing the same clothes as one of the robbers, Farias identified

Harris in court as one of the robbers.

> Q (Prosecutor). [D]o do you see a person in the courtroom today that was, that came over the counter and participated in the robbery? Do you see him in the courtroom today?
>
> A. Well, according to the video, after I calmed down, I watched the video and that is the person who I served.
>
> Q. You're talking about the person seated over here?
>
> A. (Moving head up and down) I'm not completely sure about this part, but I am on this part.
>
> Q. So, you're sure about the face of the person that robbed you; and by face, I'm pointing to this area between his nose and his mouth?
>
> A. I am. I am because I never saw his eyes.
>
> Q. And that's the person you saw in there before the robbery?
>
> A. Yes, who came to purchase, yes; and I remember because those were the last two people.
>
> Q. And then -- so, now he's back during the robbery?
>
> A. Back where?
>
> Q. This Defendant that's in court today?
>
> A. At the holdup, when we saw the video, when we saw the video, next day in the afternoon, the security person tells me that because of the clothes, it's him.
>
> Q. Security person, what security person are you talking about?
>
> A. Not security but the person who installed the cameras.

6

Q. So, the person that came in, the Defendant that you identified that came in before had the same clothes on during the robbery?

A. Yes, he had the same clothes. You can see in the video that he was wearing the same T-shirt. It was like 50, 55 minutes after it happened.

Q. But let's go back to what you remember, you remember him having the same clothes before and during the robbery?

A. Yes, just the T-shirt. I didn't see anything else, just the T-shirt. It was white.

. . .

Q. But you know – you're saying that that's the same person that came into the store before the robbery, talking on the phone?

A. Yes.

Q. And came in during the robbery with the other two people?

A. In the video, it is seen in the video that he's wearing the same clothes. You cannot see exactly the face, but those are the same clothes.

Q. And it is the same person that's seated over here at counsel table in the white shirt?

A. Yes.


Farias acknowledged on cross-examination that she did not see Harris's entire face during the robbery. Asked why she identified Harris as one of the robbers, she answered: "Because after I watched the video the second time in my house with the detective, I said to him, out of these pictures that you show me, I cannot recognize anybody. But this person right here, I do remember this part of

his face. It's the same one that I served. And I said to him I am not a hundred percent sure on his eyes, but I am on his mouth."

When asked if she gave the police a description of the robbers the night it happened, Farias testified:

> The first night, the night of the holdup, we were very nervous; but I explained [to the police] step by step how everything had happened. After that, they watched the video, I was asked if I could remember anything else, and to tell them. So, the next day is when I watched the video, and the last persons that I served can be seen there. That's when I told the detective. And when he rewinds it, that's when we become aware that he's wearing the same clothes.

## B.    The Motion for Continuance

Ten days before trial was scheduled to begin on April 15, 2011, the trial court allowed appellant to substitute counsel in the case. Two days later, Harris's newly-retained trial counsel filed a sworn motion for continuance noting that she was not prepared to announce ready for trial on April 15th. Although never explicitly ruled upon, a handwritten entry on the filed copy of the motion recited "[t]his is the atty that told me she was substituting in on a case already set for trial. She understood she had to be ready." When trial began on April 15th, the record reflects that defense counsel announced "ready."

## C.    The Trial and Oral Motion to Suppress

Immediately prior to opening statements, Harris's trial counsel informed the court of her desire to make an "oral" motion to suppress the illegal traffic stop and

8

all evidence resulting therefrom.[2]   The trial court informed counsel that having waited until the trial had begun to so move, the motion would be carried with the case and counsel could "make whatever objections [she] need[ed] to make at the time that [she] need[ed] to make them" and the court would consider any objections at that time.  Trial counsel offered to reduce her Motion to writing and the Court noted: "Just for purposes of the record, that might be helpful."  A written motion to suppress was filed on April 19, 2011, the last day of trial.

## Ineffective Assistance of Counsel

Harris asserts that his trial counsel was ineffective for a number of reasons, including her failure to file a pretrial motion to suppress, or otherwise object to, the search of the backpack and Farias's unreliable in-court identification.  Harris also cites his counsel's "no objection" to the admission of the photo array, the bank deposit bag and the deposit slip, resulting in waiver of all appellate review of the suppression issues in this case.

## D.     Standard of Review and Applicable Law

To prevail on an ineffective-assistance-of-counsel claim, the defendant must demonstrate, by a preponderance of the evidence, that (1) his trial counsel's

---

[2]   Counsel did not believe the State could establish probable cause for the stop because the surrounding circumstances were not included in any report and Officer Schmidt was not subpoenaed for trial.  Schmidt, however, was working nearby, appeared and testified later that day to the circumstances surrounding the traffic stop.

9

performance was deficient and (2) a reasonable probability exists that, but for the deficiency, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 2064, 2068 (1984). Under the first prong of *Strickland*, the defendant must show that his counsel's performance fell below an objective standard of reasonableness, which does not require showing that counsel's representation was without error. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). The second prong of *Strickland* requires the defendant to demonstrate prejudice—a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Thompson*, 9 S.W.3d at 812. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

We indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, and therefore the defendant must overcome the presumption that the challenged action constituted "sound trial strategy." *Id.* at 689, 104 S. Ct. at 2065; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009). Our review is highly deferential to counsel, and we do not speculate regarding counsel's trial strategy. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). To prevail, the defendant must provide an appellate

10

record that affirmatively demonstrates that counsel's performance was not based on sound strategy. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *see Thompson*, 9 S.W.3d at 813 (holding that record must affirmatively demonstrate alleged ineffectiveness). If the record is silent regarding the reasons for counsel's conduct—as it usually is on direct appeal—then the record is insufficient to overcome the presumption that counsel followed a legitimate trial strategy. *Tong v. State*, 25 S.W.3d 707, 714 (Tex. Crim. App. 2000); *Thompson*, 9 S.W.3d at 813–14; *see also Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001) ("[I]n the absence of evidence of counsel's reasons for the challenged conduct, an appellate court . . . will not conclude the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it.").

In rare circumstances, the trial record on direct appeal alone may present the appellate court with sufficient information to conclude that no reasonable trial strategy could justify counsel's conduct because counsel's performance falls below an objective standard of reasonableness as a matter of law, regardless of whether the record adequately reflects trial counsel's subjective reasons for acting as he did. *Cannon v. State*, 252 S.W.3d 342, 349–50 (Tex. Crim. App. 2008) (reversing conviction based on ineffective assistance of counsel raised on direct appeal). For example, if a defendant can demonstrate that defense counsel "entirely fail[ed] to

11

subject the prosecution's case to meaningful adversarial testing," so that there was a constructive denial of the assistance of counsel altogether, then prejudice, because it is "so likely," is legally presumed. *United States v. Cronic*, 466 U.S. 648, 658–59, 104 S. Ct. 2039, 2046–47 (1984).

The failure to file a motion to suppress evidence is not per se ineffective assistance of counsel. *Kimmelman v. Morrison*, 477 U.S. 365, 384, 106 S. Ct. 2574, 2587 (1986). "Counsel is not required to engage in the filing of futile motions." *Hollis v. State*, 219 S.W.3d 446, 456 (Tex. App.—Austin 2007, no pet.) (citing *Mooney v. State*, 817 S.W.2d 693, 698 (Tex. Crim. App. 1991)). Rather, to prevail on an ineffective-assistance claim based on counsel's failure to file a motion to suppress, a defendant "must show by a preponderance of the evidence that the result of the proceeding would have been different—i.e., that the motion to suppress would have been granted and that the remaining evidence would have been insufficient to support his conviction." *Id.* (citing *Jackson v. State*, 973 S.W.2d 954, 956–57 (Tex. Crim. App. 1998)). To meet this burden, the defendant must produce evidence that defeats the presumption of proper police conduct. *Id.* (citing *Jackson*, 973 S.W.2d at 957). The defendant must, therefore, develop facts and details of the search sufficient to conclude that the search is invalid. *Id.* (citing *Jackson*, 973 S.W.2d at 957). Simply contending that there "may be questions about the validity of the search" is not enough to support an ineffective-assistance

claim based on counsel's failure to move to suppress evidence. *Jackson*, 973 S.W.2d at 957.

**E. Failure to File Pretrial Motion to Suppress or Otherwise Object to Illegal Traffic Stop and Illegal Search of the Backpack**

**1. Illegal Traffic Stop**

Harris argues that his counsel should have filed a pretrial motion to suppress, or otherwise objected to, evidence seized as a result of the traffic "stop" because temporarily stopping a car in a lane of traffic, without more, is not a violation of Penal Code section 42.03. *See* TEX. PENAL CODE ANN. § 42.03(a), (b) (West 2011) (stating person commits offense if he intentionally, knowingly, or recklessly renders street or highway impassable or renders passage of that street or highway unreasonably inconvenient or hazardous).

The State, however, need not prove that a traffic offense was actually committed in order to show reasonable suspicion to warrant an investigative stop. *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001). Here, Officer Schmidt testified that Harris's vehicle, with no hazard lights activated, sat in the middle of the lane on a busy street at 5:30 p.m. on a Friday afternoon, and impeded traffic, necessitating other vehicles having to slow and bypass Harris's vehicle. This, under section 42.03, is sufficient to establish reasonable suspicion to detain and investigate Harris's vehicle. *See Lauerback v. State*, 789 S.W.2d 343, 346–47 (Tex. App.—Fort Worth 1990, pet. ref'd) (blocking one lane on busy day sufficient

to constitute rendering passage unreasonably inconvenient or hazardous); *see also Windham v. State*, No. 14-07-00193-CR, 2008 WL 2169918, at *3–4 (Tex. App.—Houston [14th Dist.] May 22, 2008, pet. ref'd) (mem. op., not designated for publication) (holding that car, stopped on feeder road for eight seconds during light traffic, was sufficient to warrant traffic stop under section 42.03); *Cashin v. State*, Nos. 14-03-01140-CR, 14-03-1141-CR, 2005 WL 975663, at *2 (Tex. App.—Houston [14th Dist.] Apr. 28, 2005, no pet.) (mem. op., not designated for publication) (holding that car stopped for fifteen seconds impeding free progress of other cars was sufficient to warrant traffic stop under section 42.03). Accordingly, not having shown that he would have prevailed had his trial counsel filed a motion to suppress this evidence on this basis, *see Jackson*, 973 S.W.2d at 957, his ineffective assistance of counsel claim consequently fails.

### 2. Illegal Search of the Backpack

Harris argues that his counsel should have filed a pretrial motion to suppress, or otherwise objected to, evidence seized as a result of the illegal search of the backpack because the State neither proved that the officer's decision to impound the vehicle and conduct an inventory search was pursuant to HPD policy, nor that HPD policy authorizes officers conducting an inventory search to search closed containers.

14

Because the record is silent as to trial counsel's reasons for not objecting to the impounding and inventory of Harris's vehicle, Harris has not overcome the presumption that trial counsel was effective. *Lopez*, 343 S.W.3d at 142; *Davis*, 930 S.W.2d at 769 (holding defendant failed to satisfy the first prong of *Strickland* because, without testimony by trial counsel, the court could not meaningfully address his reasons for not filing a motion to suppress).[3]

We overrule Harris's first issue.

## F.     Failure to File Pretrial Motion to Suppress or Otherwise Object to Farias's Unreliable Identification

Harris's second issue also contends ineffective assistance of counsel for failing to file a motion to suppress or properly object to Farias's identification of Harris as unreliable. Again, because the record is silent as to trial counsel's reasons for not filing a motion to suppress or objecting to Farias's identification of Harris, Harris has not overcome the strong presumption that counsel's decision was based on trial strategy. *Lopez*, 343 S.W.3d at 142; *Davis*, 930 S.W.2d at 769 (holding defendant failed to satisfy the first prong of *Strickland* because, without testimony by trial counsel, the court could not meaningfully address his reasons for

---

[3]     Although she did not file a pretrial motion to suppress the backpack, trial counsel obtained a non-specific running objection to Officer Schmidt's testimony regarding the backpack ("We're going to enter a running objection at this time, please, Your Honor"), and she also objected to Officer Clark's testimony regarding the backpack on the grounds that the proper chain of custody was not shown. Neither of these objections, however, has been raised on appeal.

15

not filing a motion to suppress); *see also Mata v. State*, 226 S.W.3d 425, 431 (Tex. Crim. App. 2007) (rejecting lower appellate court's conclusion that there was "no conceivable reason" for trial counsel's actions and stating that because record was silent on this point, defendant "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable").

We overrule Harris's second issue.

## G. Stating "no objection," to admission of photo array, deposit bag and deposit slip

Harris's third issue argues his counsel's ineffectiveness due to her response to the admission of the photo array, deposit bag, and deposit slip. Relying on *Lemons v. State*, 135 S.W.3d 878 (Tex. App.—Houston [1st Dist.] 2004, no pet.), Harris argues that his counsel's "no objection" so severely undermined his defense that it could not have been part of professional reasonable trial strategy. *See Lemons*, 135 S.W.3d at 882. In *Lemons*, this Court found that the record affirmatively demonstrated defense counsel's trial strategy, and that his "no objection" statement undermined that strategy to the point that his trial counsel's performance fell below an objectively reasonable professional standard. *Id.* at 883. The facts of *Lemons* are distinguishable, however, because here the record does not provide any affirmative demonstration as to the trial strategy regarding the traffic stop, search of the backpack, or identification proceedings; therefore, we cannot conclude that counsel's decision to declare "no objection" to the photo array,

16

deposit bag, and deposit slip undermined her strategy for keeping out the evidence. *Id.* at 883; *see also Mata*, 226 S.W.3d at 431 (concluding that because record was silent as to reason for counsel's conduct, defendant "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable").

We overrule Harris's third issue.

## H.     Trial Counsel's Performance Deficient as a Whole

Although not designated as a separate issue, Harris's brief sets out the argument that his trial counsel is not entitled to the presumption that her trial decisions were made pursuant to trial strategy, and that the cumulative effect of his counsel's numerous instances of ineffective assistance undermines confidence in the outcome of the case.[4]  In particular, Harris argues that the "pursuant to trial strategy" presumption is inapplicable because the record does reflect that his trial counsel, who was allowed to substitute into the case less than two weeks before trial, sought a continuance one week before trial because she "was not prepared to announce ready for trial" and needed more time.  Coupled with the numerous alleged instances of her ineffective assistance, Harris maintains that this is clear evidence that her ineffectiveness was due to inadequate preparation.  Yet, on the day of trial, counsel announced ready.  Accordingly, Harris has not rebutted the

---

[4]     We will refer to this argument as Harris's fourth issue.

17

presumption that his counsel's decisions were made pursuant to trial strategy because the record does not affirmatively demonstrate that trial counsel's actions were due to inadequate preparation.

Harris also argues that this case is similar to *Cannon* in which the Court of Criminal Appeals presumed prejudice after the defendant showed that his counsel entirely failed "to subject the prosecution's case to meaningful adversarial testing." *Cannon*, 252 S.W.3d at 349–50 (citing *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047). In *Cannon,* after the trial court denied defense counsel's motion to recuse and motion for continuance, counsel declared that he was not ready for trial, that he was unable to effectively represent his client, and that he therefore would not participate in the trial. *Cannon*, 252 S.W.3d at 350. Defense counsel then declined to: (1) participate in jury selection; (2) enter a plea for his client; (3) make an opening or closing statement; (4) cross-examine any of the State's witnesses; (5) make any objections; (6) offer any defense; (7) request any special jury instructions; or (8) offer any evidence or argument with respect to punishment. *Id.* The Court of Criminal Appeals held that counsel's behavior, considered as a whole, constructively denied the defendant his right to effective assistance of counsel because counsel "effectively boycotted the trial proceedings and entirely failed to subject the prosecution's case to meaningful adversarial testing." *Id.* at 350–52.

Here, Harris's counsel engaged in no such histrionics and participated in all aspects of the trial, including jury selection, closing statement,[5] filing motions, making objections, and cross-examining the State's witnesses. The record does not support Harris's suggestion that his counsel's lack of preparation amounted to an absence of trial strategy which entirely failed to subject the prosecution's case to meaningful adversarial testing. *See id.* at 350–52.

Accordingly, Harris has also failed to demonstrate that his case is one of those rare cases like *Cannon*, in which we can presume prejudice.[6]

We overrule Harris's fourth issue.

## I.       Failure to Request Article 38.23 Instruction

In his fifth issue, Harris argues that his trial counsel was ineffective for failing to request an article 38.23 instruction regarding the traffic stop, the inventory, and Farias's identification. *See* TEX. CODE CRIM. PROC. ANN. art. 38.23(a) (West 2005) (prohibiting admission of illegally obtained evidence against

---

[5]    Harris's co-counsel made the opening statement.

[6]    Harris also cites to *Marin v. State* for the proposition that the trial court's failure to provide his counsel with sufficient time to prepare deprived Harris of his "right to have adequate time to prepare for trial." *Marin v. State*, 891 S.W.2d 267, 270 (Tex. Crim. App. 1994). *Marin*, however, is referring to what is now article 1.051(e) of the Code of Criminal Procedure which, by its terms, only applies to appointed counsel. *See* TEX. CODE CRIM. P. ANN. art. 1.051(e) (West 2005) (stating that "an appointed counsel is entitled to 10 days to prepare for a proceeding . . ." and that this mandatory provision may be waived only with written consent of defendant or on record in open court).

19

criminal defendants and providing for jury instruction directing jury to disregard evidence that it believes or reasonably doubts was obtained illegally).

Harris acknowledges that in order to prevail on such a claim, the record must affirmatively reflect the reasons why trial counsel chose not to request the jury instruction, and that when the record provides no explanation as to the motivation behind trial counsel's actions, an appellate court should not ordinarily declare counsel's performance ineffective. *See Thompson*, 9 S.W.3d at 814. Nevertheless, Harris argues that "in light of the numerous oversights of counsel with regard to investigation, objection to, and preservation of suppression issues in this case, it is apparent from the record that counsel's mere nine days of preparation inadequately prepared her for trial." On the contrary, the record is silent as to why trial counsel chose not to request an article 38.23 instruction.

Even were Harris able to overcome the presumption of effectiveness, he has not demonstrated that he was legally entitled to an article 38.23 instruction on the grounds he asserts, and thus, he has not demonstrated his counsel's failure to request the instruction fell below an objective standard of reasonableness. *See Ex parte Chandler*, 182 S.W.3d 350, 356 (Tex. Crim. App. 2005) ("[A] reasonably competent counsel need not perform a useless or futile act, such as requesting a jury instruction to which the defendant is not legally entitled or for which the defendant has not offered legally sufficient evidence to establish. Requesting a

20

jury instruction to which one is not legally entitled, merely for the sake of making the request, is not the benchmark for a competent attorney.") (footnote omitted). A defendant's right to the submission of jury instructions under article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible. *Madden v. State*, 242 S.W.3d 504, 509–10 (Tex. Crim. App. 2007). Before a defendant is entitled to such an instruction, he must show that (1) the evidence heard by the jury raises an issue of fact; (2) the evidence on that fact is affirmatively contested; and (3) the contested factual issue is material to his claim of a constitutional or statutory violation. *See* TEX. CRIM. CODE PROC. art. 38.23 (West 2005); *Madden*, 242 S.W.3d at 510.

Only a factual dispute about how the evidence was obtained gives rise to the requirement that an article 38.23 instruction be included in the charge. *Pickens v. State*, 165 S.W.3d 675, 680 (Tex. Crim. App. 2005). When essential facts concerning the search or arrest are undisputed, the legality of the search or arrest is a question of law and no jury instruction is required. *Garza v. State*, 126 S.W.3d 79, 86 (Tex. Crim. App. 2004).

Here, Harris asserts that an article 38.23 jury instruction would result in a jury resolution of conflicting police testimony as to the discovery of outstanding warrants for Harris and Krenshaw; determine the adequacy of the State's evidence

concerning the legality of the search and seizure of the backpack; and determine whether Farias's identification of Harris had been impermissibly tainted. Harris, however, has not identified a material contested factual dispute regarding any of these topics.[7] Moreover, the Court of Criminal Appeals has held that article 38.23, by its terms, applies only to illegally obtained evidence, not to in-court identifications. *Allen v. State*, 511 S.W.2d 53, 54 (Tex. Crim. App. 1974); *see Andujo v. State*, 755 S.W.2d 138, 143 (Tex. Crim. App. 1988) (en banc). Finally, the adequacy of the State's evidence concerning the legality of the search and seizure of the backpack is not a fact question subject to an article 38.23 instruction. *See Garza*, 126 S.W.3d at 86 (stating that when essential facts concerning search or arrest are not in dispute, legality of search or arrest is question of law, not fact, and no article 38.23 jury instruction is required). Accordingly, Harris has not

---

[7] Harris argues that there is a discrepancy in the officers' testimony about a warrant permitting the arrest of Krenshaw, leading to a question of whether the car could be towed. According to Harris, Officer Zielonka testified that Officer Schmidt did not know if there was a warrant for Krenshaw's arrest, conflicting with Officer Schmidt's testimony and Officer Clark's testimony that there were warrants for both men. In fact, Officer Zielonka said that when he and Clark were first dispatched to the scene they were told that the driver had an outstanding warrant, but the officer on the scene was unsure about the passenger. Officer Clark testified that when he and Zielonka arrived at the scene Officer Schmidt informed them that both the driver and passenger had outstanding warrants. This is consistent with Officer Schmidt's testimony that both men had outstanding warrants. At most, there may be a conflict as to precisely when Officer Schmidt discovered the outstanding warrant for Krenshaw—before or after he called for backup—but there is no dispute that Schmidt had discovered warrants for both men by the time the other officers arrived and began to inventory the vehicle for towing.

shown that he was entitled to an article 38.23 instruction. *See Hardin v. State*, 951 S.W.2d 208, 211 (Tex. App.—Houston [14th Dist.] 1997, no pet.) (rejecting claim for ineffective assistance where trial counsel failed to request article 38.23 instruction when evidence established that he was not entitled to instruction and therefore it did not affect outcome of case). Trial counsel's failure to request an instruction to which Harris was not entitled is not ineffective assistance. *See id.*

We overrule Harris's fifth issue.

## J. Failure to Object to Testimony Comparing Robbers to Animals and Closing Argument Referring to Said Testimony

In his sixth issue, Harris asserts that his counsel was deficient for failing to object to Farias's testimony that she thought that he and the other robbers were animals when they first jumped over the counter and the State's reference to that testimony in closing argument. In particular, Farias testified that she first thought animals had leapt over the counter at McDonalds:

> Yes, because at the beginning I didn't even imagine that those were people. I thought they were like animals when they jumped. On the—at the first statement I didn't know how many they were until I saw the video.

During closing arguments, the State referred to the robbers as "those three animals" when discussing Farias's testimony. The State also specifically compared Harris to an animal: "He was one of those three. He jumped over the counter like animals."

23

The record does not disclose trial counsel's reasons for not objecting to Farias's description of Harris and the other robbers as being animal-like, or the State's summation of that testimony in closing argument, therefore Harris has not overcome the presumption that the challenged action constituted "sound trial strategy." *See Mata*, 226 S.W.3d at 431; *see also Johnson v. State*, 233 S.W.3d 109, 116 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (absent contrary showing in record, it must be presumed that counsel's failure to object to State's argument was part of valid, considered trial strategy, and did not constitute deficient performance). Furthermore, Harris provided no authority or argument to show why Farias's testimony of her initial perception that the robbers jumping over the counter were animal-like was inadmissible, or that the State's summation was improper. *See Guidry v. State*, 9 S.W.3d 133, 154 (Tex. Crim. App. 1999) (proper jury argument encompasses summation of evidence presented at trial).

We overrule Harris's sixth issue.

### Motion for Continuance

In his seventh and eighth issues, Harris posits that if the handwritten notation on the motion for continuance constitutes a denial, then, in light of counsel's lack of preparation, the court abused its discretion and his counsel was ineffective for failing to ensure that the record reflected the reasons why a continuance was necessary and how Harris was harmed by the court's denial of the motion.

## A. Preservation of Error

To preserve a complaint for appellate review, the record must show the trial court ruled on the motion, either expressly or implicitly. TEX. R. APP. P. 33.1(a)(2)(A); *Salazar v. State*, 95 S.W.3d 501, 505 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd); *see also McKinney v. State*, 59 S.W.3d 304, 313 (Tex. App.—Fort Worth 2001, pet. ref'd) (noting motion for continuance was implicitly overruled). Eight days before trial, Harris's trial counsel filed a sworn motion for continuance averring that she was not prepared to announce ready for trial on April 15th. Nevertheless, when trial began as scheduled on April 15th, the record indicates that defense counsel answered ready for trial.[8] Thus, although the motion for continuance was never expressly ruled upon, the trial court implicitly overruled counsel's motion for a continuance by proceeding to trial. *See McKinney*, 59 S.W.3d at 313.[9]

## B. Standard of Review and Applicable Law

We review a trial court's ruling on a motion for continuance for abuse of discretion. *Gallo v. State*, 239 S.W.3d 757, 764 (Tex. Crim. App. 2007). To establish an abuse of discretion, a defendant must show he was actually prejudiced

---

[8] Although the motion was never explicitly ruled upon, someone noted on the filed copy of the motion that "[t]his is the atty that told me she was substituting in on a case already set for trial. She understood she had to be ready."

[9] Having determined that the motion was implicitly denied, we need not consider whether the notation made on the motion constitutes a ruling on the motion.

by the denial of his motion. *Id.* If the motion for continuance was based on a claim of inadequate preparation, there must be a showing that the defendant was prejudiced by his counsel's inadequate preparation time. *Hernandez v. State*, 643 S.W.2d 397, 399–400 (Tex. Crim. App. 1982) (en banc).

Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance. *See Renteria v. State*, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006). An appellate court will conclude the trial court's denial of a motion for continuance was an abuse of discretion "only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had." *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010). A defendant can ordinarily make such a showing at a hearing on a motion for new trial because only then will he be able to produce evidence regarding what additional information, evidence, or witnesses the defense would have had available if the trial court had granted the motion for delay. *Id.* at 842–43.

No motion for new trial having been filed, there was never a record as to how Harris was harmed by the absence of more preparation time with "considerable specificity." *See id.*[10] Without such a record we cannot say that the trial court abused its discretion by denying the motion for continuance. *See id.*

---

[10]    Harris points out in his reply brief that his trial counsel also initially represented him on appeal and that she would have been the one to file any such motions for new trial. By the time the public defenders' office was appointed to represent him

26

With respect to Harris's assertion that his counsel was ineffective for failing to ensure that the record reflected the reasons why a continuance was necessary and why Harris was harmed by the court's denial of the motion, the record is silent as to why counsel chose not to ask for a hearing on her motion or file a motion for new trial. As such, Harris has failed to overcome the presumption that counsel's performance was based on sound strategy. *See Mata*, 226 S.W.3d at 431 (concluding that because record was silent as to reason for counsel's conduct, defendant "failed to rebut the presumption that trial counsel's decision was in some way—be it conceivable or not—reasonable"); *see also Mallett*, 65 S.W.3d at 63; *Thompson*, 9 S.W.3d at 813.

We overrule Harris's seventh and eighth issues.

---

on appeal, the time for filing a motion for new trial had long since passed. Although the lack of a motion for new trial is often an impediment to a defendant's successful assertion of ineffective assistance of counsel on direct appeal, the lack of a motion for new trial does not preclude Harris's ability to challenge his conviction on ineffective assistance grounds. As the Court of Criminal Appeals has repeatedly acknowledged, "Generally, post-conviction writ proceedings are a better forum for pursuing relief on an ineffective assistance of counsel claim." *Freeman v. State*, 125 S.W.3d 505, 506–07 (Tex. Crim. App. 2003).

## Conclusion

We affirm the trial court's judgment.

Justice Jim Sharp
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

Do not publish.   TEX. R. APP. P. 47.2(b).