

## NUMBER 13-18-00339-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

TRISTAN KADE TORRES, Appellant,

v.

THE STATE OF TEXAS, Appellee.

**On appeal from the 18th District Court
of Johnson County, Texas.**

## MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Hinojosa
Memorandum Opinion by Justice Hinojosa**

A jury convicted appellant Tristan Kade Torres of murder, a first-degree felony, and aggravated assault with a deadly weapon, a second-degree felony. *See* TEX. PENAL CODE ANN. §§ 19.02(c), 22.02(a)(2). The trial court sentenced Torres to thirty-five years of incarceration in the Texas Department of Criminal Justice-Institutional Division for the

murder count and twenty years for the aggravated assault offense count, to run concurrently.

By four issues, Torres challenges: (1) the trial court's failure to include a culpable mental state in the indictment and jury charge, and whether deadly conduct can be used as an underlying felony for felony murder; (2) the trial court's allowance of continued questioning after a witness invoked his Fifth Amendment right against self-incrimination; (3) the prosecution's alleged improper jury argument; and (4) the trial court's failure to grant a continuance for sentencing. We affirm.

## I.  BACKGROUND[1]

### A.  The Night of the Offense

On April 22, 2017, two rival groups of teenagers met behind a movie theater in Johnson County, Texas, to watch a member of each group fight. The first group consisted of appellant Torres's friends, including Christopher Castillo, Keon Mann, and Alexis Nevill (Torres was not at the fight). The second group included Dylan Brown, Colton Fugitt, Cody Hoffman, and twin brothers Cameron and Camden Lewis. Castillo represented the former group and Brown represented the latter. After the fight, both sets of teenagers went their separate ways.

Later that evening, Torres met up with his friends at a local Walmart gas station. Torres became upset upon seeing his friend Castillo's battered face and injuries. He then called Fugitt and demanded to fight him. Fugitt agreed. The groups arranged to meet

---

[1] This case is before this Court on transfer from the Tenth Court of Appeals in Waco pursuant to a docket-equalization order issued by the Supreme Court of Texas. *See* TEX. GOV'T CODE ANN. § 73.001.

again at Mound Elementary, a local primary school. Before he left, Torres allegedly told his friends, "I'm going to pull up and just start shooting and leave."

Fugitt and his friends arrived at the school first. Fugitt got out of his truck and was joined by Brown and Camden Lewis. Cameron Lewis remained inside in the driver's seat and Hoffman sat in the passenger seat. Approximately fifteen minutes later, Torres arrived in his own vehicle, and his friends Castillo, Mann, and Nevill followed in another truck right behind him. Torres and his friends were approximately one hundred yards away from the rival group. At this point, Torres grabbed a .40 caliber pistol he had inside of his vehicle. He rolled down his passenger window and, reaching across the passenger seat, shot the gun in the direction of Fugitt's truck. One bullet struck Camden Lewis in the foot and another bullet fatally struck Cameron Lewis on the left side of his head.

## B.    The Indictment

On May 4, 2017, the State indicted Torres on two counts: Count One was for murder and Count Two was for aggravated assault with a deadly weapon. Count One had three different paragraphs setting forth three different methods of committing murder. Relevant to this case, Paragraph Three listed deadly conduct as the predicate felony for the felony murder theory:

> Paragraph Three: And the Grand Jurors aforesaid upon their oaths do further present in and to said court that Tristan Kade Torres[,] on or about April 22, 2017[,] and before the presentment of this indictment in Johnson County, Texas, did then and there intentionally and knowingly commit or attempt to commit an act clearly dangerous to human life, to wit: shooting Cameron Lewis with a firearm, that caused the death of Cameron Lewis, and the Defendant was then and there in the course of intentionally and knowingly committing a felony, to wit: deadly conduct, and the death of the [sic] Cameron Lewis was caused while Defendant was in the course and in the furtherance of the commission or attempt of the felony.

3

*See id.* § 19.02(b)(3).

Nearly a year later, on April 16, 2018, the State filed a motion to amend the indictment to change the language of "shooting Cameron Lewis with a firearm" to "shooting in the direction of Cameron Lewis with a firearm." Two days later, on April 18, 2018, the State filed yet another motion to amend, requesting that the culpable mental states of "intentionally or knowingly" be deleted both times they appeared in Paragraph Three of Count One.

Torres objected to these motions and also filed a motion to quash the indictment. He argued that the predicate felony (deadly conduct) is not necessarily the same as the "act dangerous to human life" which caused Cameron Lewis's death. At a hearing on the motions, Torres urged this argument and also contended that the State should be required to prove that Torres committed deadly conduct "intentionally" or "knowingly." Not requiring this, he argued, allowed the State to do an end-run around a manslaughter charge, which only requires a "reckless" culpable mental state. *See id.* § 19.04(a). The trial court granted the State's motions to amend the indictment and denied Torres's motion to quash.

## C.     Trial

Trial began on May 1, 2018. Several witnesses testified, including Torres's friends Mann and Castillo. Mann testified that he heard Torres say, "I'm going to pull up and just start shooting and leave. . . That's exactly what he said. . . . As soon as I heard Tristan say that he was about to shoot someone I was like, [m]an, just drop me off."

4

Castillo was also called to the witness stand. Castillo was Torres's friend who initially fought against Brown behind the movie theater. After he was called to the stand, Castillo unexpectedly invoked his Fifth Amendment right not to incriminate himself. The judge immediately took a recess and dismissed the jurors from the courtroom. The court asked the State if Castillo had any pending charges arising from this incident. The State confirmed that that there were no pending charges. The court, out of an abundance of caution, appointed counsel to Castillo. Trial proceeded with the following questioning:

STATE: Mr. Castillo, on April 22nd, 2017, did you and Dylan Brown get into a fight?

CASTILLO: I wish to use my 5th Amendment right.

STATE: Mr. Castillo, after that fight with Dylan Brown, did you and Dylan shake hands or fist bump and basically call the fight over?

CASTILLO: I wish to use my 5th Amendment right.

STATE: And after that fight was over, did you in fact go to the Walmart gas station to meet up with Tristan?

CASTILLO: I wish to use my 5th Amendment right.

STATE: And after you met up with Tristan, did Tristan see your face and that you were a little bit bloody from that fight?

CASTILLO: I wish to use my 5th Amendment right.

STATE: And after Tristan saw your face, did he get mad?

CASTILLO: I wish to use my 5th Amendment right.

STATE: And after Tristan got mad, did he say anything to you?

CASTILLO: I wish to use my 5th Amendment right.

STATE: So did Tristan tell you that he was going to go shoot them?

5

CASTILLO: I wish to use my 5th Amendment right.

STATE: And after Tristan told you he was going to go shoot them—

TORRES: Your Honor, at this time I would object and ask to take the witness briefly on Voir Dire.

COURT: Okay.

TORRES: Mr. Garcia [sic], is there any question—Castillo. Mr. Castillo, excuse me. Is there any question that the prosecutor is going to answer—ask you that you're not going to answer with the 5th Amendment right of indication [sic]?

CASTILLO: No, I'm going to use the 5th Amendment.

TORRES: Judge, at this point I would object to any further testimony under 403 of Texas Rules—and 402 of the Texas Rules of Evidence.

COURT: Response?

STATE: Judge, he's not entitled to a blanket 5th Amendment right. He's a witness in this case. He's not the Defendant. He's not entitled to the blanket 5th Amendment right. If he doesn't want to answer the question, he has to respond after each question.

The trial court overruled the objection. The prosecution asked Castillo four more questions, all of which he responded to by asserting his Fifth Amendment right. Torres's counsel then asked a few questions to confirm that they had never met before. The court then dismissed Castillo as a witness.

After a two-day trial, a jury convicted Torres of murder and aggravated assault with a deadly weapon. Torres elected for the court to sentence him.

**D.    Punishment**

When the parties arrived on May 3, 2018 to begin the punishment phase, Torres's

6

counsel urged a sudden oral motion for continuance. He argued that the motion was "based on evidence that was delivered to me in a timely manner by the prosecution because they only received it last night." The evidence was apparently a statement Torres disclosed during a recorded phone call the night before, but the content of the statement was not explained on the record. Torres's counsel further contended,

> I'm not ready and am unable to effectively represent my client in the sentencing phase of these proceedings. We would ask that Dr. Price and associates be appointed to evaluate my client and we will return to court—hopefully return to court after such evaluation has been completed. This motion is being made in the interest of justice and I believe the Court would believe not for delay.

The judge, in considering the motion, stated:

> Just for the record, I have talked with all three attorneys back in my office about this issue. It's too important of an issue to hurry through, to rush through. I want to consider everything and I want both sides to have an equal opportunity, fair opportunity to present their cases. I don't like delays but sometimes they're necessary.

The judge granted the continuance and rescheduled the sentencing for May 15, 2018. On May 15, however, Torres's counsel moved for another continuance. He claimed that his expert performed a competency exam instead of the risk assessment he wanted and he asked the court to delay punishment again. The prosecution countered that a continuance had already been granted and that it was defendant's lack of diligence in following up with his expert that caused this problem. The court denied the second motion for continuance and proceeded with the punishment phase.

> During closing argument, the State made the following argument:

> And the reason we played those recordings for you, Judge, is so you can understand the mind-set of Tristan. He's been in jail for over a year now and he still does not accept responsibility for what he did. He still does not accept

7

responsibility for shooting and killing Cameron Lewis. Not once have you heard him say I'm sorry that Cameron's dead. I'm sorry that I shot Cameron, I'm sorry that I shot Camden, because he's not. He's sorry that he got in trouble, he's sorry he's in jail and he's sorry that he's going to go to prison but he's not sorry at all for killing Cameron, for shooting Camden, and for taking this young man away from his family.

. . . .

Judge, up to this point after spending over a year in jail not once has he shown any remorse. Not once has he ever shown any type of sympathy, any type of remorse, any type of emotion on the fact that he killed Cameron Lewis. And because of that, Judge, there's—he deserves a significant sentence and, honestly, there's no sentence that can be too high in this case.

The trial court sentenced Torres to thirty-five years of incarceration for the murder count and twenty years for the aggravated assault offense count, and it ordered the sentences to run concurrently. Torres appealed.

## II.     THE FELONY MURDER CHARGE

By his first issue, Torres argues that the factfinder in a felony murder prosecution where deadly conduct is the predicate felony should be required to determine whether the defendant "intentionally" or "knowingly" committed the act that caused the death of the individual. Here, the court granted the State's motion to amend the indictment to delete the culpable mental states, and it also failed to include the culpable mental states in the jury charge. Torres argues that the failure to include a culpable mental state gave "the State free reign to use deadly conduct to get around the manslaughter exception out of the felony murder rule for all cases in which a firearm was knowingly discharged."

### A.     Applicable Law and Standard of Review

Under the felony murder doctrine, a person may be convicted of murder if he

8

commits or attempts to commit a felony other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.02(b)(3).

In this case, the State charged Torres with deadly conduct as the predicate felony for felony murder. Texas Penal Code § 22.05(b) sets out the felony offense of deadly conduct as follows:

> A person commits an offense if he knowingly discharges a firearm at or in the direction of:
>
> (1)    one or more individuals; or
>
> (2)    a habitation, building, or vehicle and is reckless as to whether the habitation, building, or vehicle is occupied.

*Id*. § 22.05(b).

Torres claims it was error to fail to include a culpable mental state in the indictment or the jury charge. We review a trial court's decision to deny a motion to quash an indictment under a de novo standard. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007). And when determining whether there was jury charge error, an appellate court must first determine whether error actually existed in the charge. *Ngo v. State,* 175 S.W. 3d 738, 743 (Tex. Crim. App. 2005). If error is found, then we must determine whether it caused sufficient harm to require reversal. *Id.* at 744. The degree of harm required for reversal depends on whether the error was preserved. *Arline v. State,* 721 S.W. 2d 348, 351 (Tex. Crim. App. 1986). If no proper objection was made at trial, then the error requires reversal only if is so egregious and created such harm that the

9

appellant has not had a fair and impartial trial. *Almanza v. State,* 686 S.W. 2d 157, 171 (Tex. Crim. App. 1984). When there is a timely objection to an improper jury charge, we need only inquire if there was some harm. *Id*.

## B.     Analysis

Torres contends that he was guilty of manslaughter, not felony murder.[2] A person commits manslaughter if he recklessly causes the death of an individual. *See* TEX. PENAL CODE ANN. § 19.04(1). And a person acts recklessly when he or she is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. *Id*. § 6.03(c). Here, Torres suggests that his deadly conduct—shooting out of his passenger window—was "reckless." *See id*. § 19.02(a). Consequently, given his "reckless" mental state, he asserts his crime should have been charged as manslaughter, which is specifically excluded as a predicate felony under § 19.02(b)(3). *See id*. § 19.02(b)(3).

We note, however, that a person commits felony deadly conduct only if he acts "knowingly." *See id*. § 22.05(b)(1). This is how the State charged Torres. *See id*. The "knowingly" mental state is a higher culpable mental state than the recklessness one required for manslaughter. *See id*. §§ 6.02(d), 19.04(a), 22.05(b)(1). Accordingly, it was proper for deadly conduct to be used as the underlying felony for felony murder under penal code § 19.02(b)(3) in this case. *See Miles v. State*, 259 S.W.3d 240 (Tex. App.— Texarkana 2008, pet. ref'd) (holding that deadly conduct was a proper underlying felony under the felony murder rule); *Yandell v. State*, 46 S.W.3d 357 (Tex. App.—Austin 2001, pet. ref'd) (same); *see also Freeland v. State*, No. 05-02-01746-CR, 2003 WL 22456353,

---

[2] The jury charge included manslaughter as a lesser included offense.

10

at *2 (Tex. App.—Dallas Oct. 30, 2003, no pet.)(mem. op., not designated for publication) (same).

Furthermore, felony murder, as set out in § 19.02(b)(3), does not require a specific culpable mental state for the "act clearly dangerous to human life" which causes death. The Texas Court of Criminal Appeals has interpreted § 19.02(b)(3) to indicate a clear legislative intent to dispense with a culpable mental state. *See Lomax v. State,* 233 S.W. 3d 302, 304 (Tex. Crim. App. 2007) (citing *Aguirre v. State,* 22 S.W.3d 463, 470 (Tex. Crim. App. 1999)). This construction is consistent with the historical purpose of the felony murder rule, which is to convict a person of an "unintentional" murder when he or she causes another person's death during the commission of a felony. *See id.* at 305 (citing *Threadgill v. State,* 146 S.W.3d 654, 665 (Tex. Crim. App. 2004)).

In light of this, we conclude that the trial court did not err when it denied Torres's motion to quash the indictment for failing to include a culpable mental state. *See Lawrence,* 240 S.W.3d at 915. In addition, there was no jury charge error as a culpable mental state for the "act clearly dangerous to human life" is not necessary for the offense of felony murder. *See Ngo,* 175 S.W.3d at 743. Because we find no error, no harm analysis is required. *Id.* at 744. We overrule Torres's first issue.

### III.   RIGHT AGAINST SELF-INCRIMINATION

Torres's third issue claims that it was "harmful error for the trial court to allow the State to ask fact-laden questions to a witness who validly asserted his Fifth Amendment right against self-incrimination in order to establish a material fact that was not proven by any other evidence in the record."

## A.      Applicable Law

Both the United States Constitution and the Texas Constitution guarantee an accused the right not to be compelled to testify or give evidence against himself. *See* U.S. CONST. amend. V ("No person . . . . shall be compelled in any criminal case to be a witness against himself . . . ."); TEX. CONST. art. I, § 10; *In re Medina*, 475 S.W.3d 291, 299 (Tex. Crim. App. 2015).

> The scope of the Fifth Amendment is comprehensive, protecting the individual not only against being involuntarily called as a witness against himself in a criminal prosecution, but also permitting him "not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings."

*In re Medina*, 475 S.W.3d at 299 (quoting *Lefkowitz v. Turley,* 414 U.S. 70, 77 (1973)).

"Trial courts are not to simply take the word of potential witnesses who claim to fear prosecution." *Walters v. State*, 359 S.W.3d 212, 215 (Tex. Crim. App. 2011). A danger of "imaginary and unsubstantial character" will not support the assertion of a Fifth Amendment right against self-incrimination. *Id.* (citing *Ohio v. Reiner*, 532 U.S. 17, 21 (2001)). "The privilege's protection extends only to witnesses who have 'reasonable cause to apprehend danger from a direct answer.'" *Id*. (citing *Hoffman v. United States*, 341 U.S. 479, 486 (1951)). Furthermore, "[b]lanket assertions of the federal or state privilege against self-incrimination are impermissible." *In re Verbois*, 10 S.W.3d 825, 828 (Tex. App.—Waco 2000, no pet.). "Rather, the privilege must be asserted on a question-by-question basis." *Id*.; *see Stephens v. State*, 59 S.W.3d 377, 380–81 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) (concluding that because "each additional question may raise new potential for self-incrimination, . . . once the witness invokes the privilege,

the court must determine 'whether the question present[s] a reasonable danger of further crimination in light of all the circumstances, including any previous disclosures'" (citing *Rogers v. United States,* 340 U.S. 367, 374 (1951))).

## B.     Analysis

Torres's main argument regarding this issue contends that it was error to allow the State to continue questioning Castillo because its questions "craft[ed] a narrative that no witness could actually testify to." Specifically, Torres argued that, though the State asked questions such as, "So did Tristan tell you that he was going to go shoot them?", no witness testified regarding Torres's alleged intent to shoot a person. Torres's brief asserted:

> None of [Torres's] friends actually testified at trial that [Torres] stated he was going to Mound Elementary School because he planned to shoot someone. The jury only learned of this statement through the State's line of questioning that conveyed the knowledge allegedly possessed by Castillo, without Castillo ever giving a substantive response for the jury to properly consider.

We disagree. In his testimony, Keon Mann explicitly testified that Torres told him, "I'm going to pull up and just start shooting and leave." Mann further clarified, "That's exactly what he said. . . . As soon as I heard Tristan say that he was about to shoot someone I was like, [m]an, just drop me off." Torres argues that there is a difference between Torres saying, "I'm going to pull up and start shooting and leave" and "I'm going to go shoot somebody." This difference is negligible and it did not "craft[] a narrative that no witness could actually testify to."

Because blanket assertions of the Fifth Amendment right against self-incrimination are not allowed, Castillo had to assert this right on a question-by-question basis. *In re*

13

*Verbois*, 10 S.W.3d at 828. We hold that it was not error for the trial court to allow the State to continue to question Castillo, even when it knew he would continue to assert his Fifth Amendment right. We overrule this issue.

## IV.    IMPROPER JURY ARGUMENT

By his fourth issue, Torres argued the prosecution made an improper jury argument by allegedly commenting on Torres's failure to testify. *See* U.S. CONST. amend. V; TEX. CONST., art. 1 § 10 ("In all criminal prosecutions the accused . . . shall not be compelled to give evidence against himself . . . ."); TEX. CODE CRIM. PROC. ANN. art. 38.08. Torres focuses on counsel's statements during punishment closing argument such as, "Not once have *you heard him say* I'm sorry that Cameron's dead. I'm sorry that I shot Cameron, I'm sorry that I shot Camden, because he's not . . . . Not once *has he ever shown* any type of sympathy, any type of remorse, any type of emotion on the fact that he killed Cameron Lewis." (Emphasis added).

Torres, however, did not object to these statements during the prosecution's argument. The Texas Court of Criminal Appeals has held that a "defendant's 'right' not to be subjected to incurable erroneous jury arguments is one of those rights that is forfeited by a failure to insist upon it." *Cockrell v. State*, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996). To preserve this type of error for appellate review, one must: (1) object; (2) request an instruction to disregard; and (3) move for a mistrial. *See McFarland v. State*, 989 S.W.2d 749, 751 (Tex. Crim. App. 1999)(en banc). This procedure applies to complaints regarding alleged improper argument, and Torres failed to follow it. *See id*.; *Cockrell*, 933 S.W.2d at 89. We conclude this issue has not been preserved for our review and is thus

14

waived. *See* TEX. R. APP. P. 33.1.

<h2 style="text-align:center">V.    MOTION FOR CONTINUANCE</h2>

By his final issue, Torres claims the trial court abused its discretion when it denied his second motion for continuance of the punishment and sentencing phase.

## A.    Applicable Law

"The granting or denying of a motion for continuance is within the sound discretion of the trial court." *Renteria v. State*, 206 S.W.3d 689, 699 (Tex. Crim. App. 2006) (citing *Heiselbetz v. State,* 906 S.W.2d 500, 511–12 (Tex. Crim. App. 1995)). "A defendant must show 'specific prejudice to his defense' to establish that the trial court abused its discretion in refusing to grant a continuance." *Id*. (quoting *Hernandez v. State*, 643 S.W.2d 397, 399–400 (Tex. Crim. App. 1982). A trial court abuses its discretion when it acts without reference to any guiding rules or principles or when its decision is so clearly wrong that it lies outside the zone of reasonable disagreement. *Gallo v. State*, 239 S.W.3d 757, 777 (Tex. Crim. App. 2007).

## B.    Analysis

At the outset, we note that the court granted Torres's first motion for continuance. When the sentencing phase was about to begin on May 3, 2018, Torres's counsel revealed that he had just received notice regarding a statement his client made. In light of this knowledge, Torres's counsel requested a continuance to allow a mental health professional to "evaluate" his client. The type of evaluation counsel sought was not mentioned on the record, nor does the clerk's record show that Torres followed up his request with a formal written motion requesting a certain type of evaluation. The trial court

15

agreed to the continuance, commenting that Torres's apparent recorded statement created too "important of an issue to hurry through, to rush through." The trial court granted a twelve-day continuance and ordered the parties to return on May 15, 2018.

On the day punishment and sentencing was set to begin, however, Torres's counsel moved for yet another continuance. He explained that his expert performed a *competency* evaluation instead of the *risk assessment* evaluation he wanted:

> I had not heard anything from Dr. Price's office so I followed up a couple of days later to have a discussion with them only to find out that Dr. Reed had already visited my client, which I thought was odd. Being, as I said, we hadn't had a conversation at all about what it was she was to be doing. So, I found out that she had already visited with my client. We played phone tag. I got ahold of her after she submitted the report wherein she determined that my client was competent. I never said the words "competency." It was never discussed. It's not in an order, not anything I asked for, not anything that was intended but that's what she did. And that's what we have paid her for up to this point. When we—we got together on the phone, I discussed what my intentions were. She reported back to me that she could see him to do a risk assessment by the end of the week and possibly be ready to testify the following week in regards to what her findings were.
>
> So at this point we would ask for a continuance just long enough to allow Dr. Reed to complete the task that was initially the intent was to request.

The prosecution countered that a continuance had already been granted and that defendant's failure to properly communicate with his expert caused this scenario. The State argued, "Dr. Reed is the defense's expert and . . . it's their responsibility to communicate with Dr. Reed as to what type of evaluation they want to have performed." The court denied Torres's second motion for continuance and proceeded with the punishment phase.

While the record shows Torres made a statement on a recorded phone call that prompted his attorney to request an evaluation and the trial court to grant an initial

16

continuance, we do not know the substance of that statement. We also do not know, and Torres fails to explain, how a risk assessment would have affected punishment or sentencing. Accordingly, we conclude that Torres did not show "specific prejudice" as to how the denial of the continuance would have affected this case. *See Hernandez*, 643 S.W.2d at 399–400 (denying a continuance where "no specific, serious matter has been raised by the appellant and the record does not otherwise show that the appellant's defense was prejudiced by counsel not having more time to prepare . . ."); *Renteria*, 206 S.W.3d at 699. Considering this record, we cannot conclude the trial court abused its discretion when it denied Torres's second request for continuance. *Gallo*, 239 S.W.3d at 777. We overrule this issue.

### V. CONCLUSION

We affirm the trial court's judgment.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
2nd day of April, 2020.

17